368 A.2d 699

COMMONWEALTH of Pennsylvania,
Appellant,

v.

Warren BRADY.

COMMONWEALTH of Pennsylvania,
Appellant,

v.

Henry GEORGE.

Supreme Court of Pennsylvania.

Argued Jan. 13, 1975.

Decided Jan. 28, 1977.

Israel Packel, Atty. Gen., Harrisburg, Kenneth Biehn, Dist. Atty., Stephen B. Harris, Asst. Dist. Atty., Doylestown, B. Lerner, Philadelphia, for appellant.

No appearance for appellees.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

OPINION

NIX, Judge.

The case presently at bar raises questions concerning the authority of a court, under the Act of November 22,

1968, P.L. 1080, 19 P.S. §§ 640.1 et seq. (Supp.1975–76) (hereinafter referred to as Immunity Act), to grant immunity from prosecution to a witness appearing before an indicting grand jury. The Superior Court affirmed the order of the Bucks County Court of Common Pleas denying the Commonwealth's petition for a grant of immunity. The Commonwealth appealed. We affirm.

The pertinent facts disclose that by a criminal complaint filed on August 10, 1972, Warren Brady and Henry George were charged with the crimes of "extortion, prohibited acts by public officers, and conspiracy." The complaint alleged that Brady and George, in their capacity as Bansalem Township supervisors, had extorted money and other rewards from construction contractors Joseph D'Egidio and John Carmerlengo, in return for favorable action on certain subdivision approvals and zoning changes needed by D'Egidio and Carmerlengo in their construction business.

At a preliminary hearing held on August 18, 1972, both defendants were bound over to court on the charges of extortion and prohibited acts by a public officer. The prosecuting attorney, however, withdrew the conspiracy charge.

On February 16, 1973, the remaining charges were presented to the regularly convened January Term, 1973, Bucks County Grand Jury. At this proceeding, D'Egidio and Carmerlengo were subpoenaed to testify regarding their transactions with the defendants. Both witnesses appeared, but refused to answer certain questions on the basis of their constitutional privilege against self incrimination.[1] The supervising judge subsequently sustained their refusal to testify.

On March 2, 1973, the Attorney General, joined by the Bucks County District Attorney, petitioned the Court of Common Pleas for an order immunizing D'Egidio and

1. U.S.Const. Amends. V and XIV; Pa.Const. art. I, § 9.

Carmerlengo from prosecution and compelling them to testify. The court dismissed the petition, however, concluding that since the bill of indictment presented to the indicting grand jury did not allege a conspiracy, it was not a proceeding "related to organized crime or racketeering" as required by the Immunity Act. The court therefore held that it was without authority to confer the grant of immunity and order the witnesses to testify.[2]

The Commonwealth appealed the court's order to the Superior Court, which affirmed per curiam.[3] This Court granted the Commonwealth's petition for allowance of appeal[4] to resolve the questions raised concerning the scope and applicability of the Immunity Act.

## I.

The Fifth Amendment to the United States Constitution provides in relevant part that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S.Const. Amend. V. The policies and rationale underlying this privilege against self incrimination were succinctly stated by the United States Supreme Court in *Murphy v. Waterfront Commission of New York Harbor*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).

> The privilege against self-incrimination "registers an important advance in the development of our liberty—'one of the great landmarks in man's struggle to make himself civilized.'" It reflects many of our fundamental values and most noble aspirations: our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt;

2. *Commonwealth v. Brady and Commonwealth v. George*, 69 D. & C.2d 146, 24 Bucks 149 (1973).

3. 228 Pa.Super. 233, 323 A.2d 866 (1974). Judge Cercone filed a dissenting opinion which was joined by Judge Spaeth.

4. *See* Appellate Court Jurisdiction Act, Act of July 31, 1970, P.L. 673, art. II, § 204(a), 17 P.S. § 211.204(a) (Supp.1975–76).

our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates "a fair state—individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load," our respect for the inviolability of the human personality and of the right of each individual "to a private enclave where he may lead a private life," our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes "a shelter to the guilty," is often "a protection to the innocent." *Id.* at 55, 84 S.Ct. at 1596. (footnotes and citations omitted).

On another occasion, the court in discussing the privilege stated that:

No doubt the constitutional privilege may, on occasion, save a guilty man from his just deserts. It was aimed at a more far-reaching evil—a recurrence of the inquisition and the Star Chamber, even if not in their stark brutality. Prevention of the greater evil was deemed of more importance than occurrence of the lesser evil. Having had much experience with a tendency in human nature to abuse power, the Founders sought to close the doors against like future abuses by law-enforcing agencies. *Ullman v. United States,* 350 U.S. 422, 428, 76 S.Ct. 497, 501, 100 L.Ed. 511 (1956).

The Fifth Amendment thus defines the relationship between the government and the citizenry. It serves the function in our constitutional democracy of balancing are privacy and dignity of the individual with the power of the government to obtain testimony. While it may generally be asserted that the public "has the right to every man's evidence," that right is clearly limited by and sub-

ject to the Fifth Amendment. *Counselman v. Hitchcock,* 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892).

█ It has been recognized, however, that a grant of immunity may "supplant" the Fifth Amendment privilege, provided that it is coextensive with that privilege. This principle is premised upon the view that immunity leaves the witness and the government in substantially the same position as if the witness had claimed his privilege.[5] *See, e. g., Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1971); *Counselman v. Hitchcock, supra.* While we recognize that immunity can be a valuable prosecutorial tool, we must also consider, however, that it constitutes an extraordinary exercise of power. It cannot be denied that a grant of immunity authorizes and even encourages interrogation which would otherwise be prohibited by the Fifth amendment.[6] Therefore, if a grant of immunity is to erase the line drawn by the privilege between government and citizen, it must be done so with the utmost care, and with the least possible infringement of Fifth Amendment rights. For this reason, we reject at the outset the Commonwealth's assertion that the Immunity Act is a "sweeping provision" which must be "broadly construed." [7] To the

5. It is quite clear, however, that immunity statutes in operation do not fully preserve the status quo provided by the privilege. *See, e. g., Patrick v. United States,* 524 F.2d 1109 (7th Cir. 1975) (defendant subjected to $900,000.00 jeopardy assessment by I.R.S. on basis of immunized testimony). Compelled testimony has also been used to impeach. *See* Comment, *The Fifth Amendment and Compelled Testimony: Practical Problems in the Wake of Kastigar,* 19 Vill.L.Rev. 470, 481 (1974).

6. Testimony is still "compelled" in the literal sense under a grant of immunity. As a means of obtaining statements, a grant of immunity merely substitutes the threat of contempt and a jail term for the beatings, intimidation and psychological coercion proscribed by the Fifth Amendment. *See Ullman v. United States,* 350 U.S. 422, 446, 76 S.Ct. 497, 100 L.Ed. 511 (1956) (Douglas, J., dissenting).

7. The Commonwealth contends that a grand jury's powers are traditionally broad, *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), and that privileges against testi-

contrary, the delicate balance created by the privilege requires that the Act be construed according to its express terms, and that its applicability be limited to only those proceedings clearly within the purview of the language employed by the legislature. It is with this principle in mind that we approach our analysis and interpretation of the Immunity Act.

## II.

The threshold question raised by this appeal concerns whether the Immunity Act may be employed to immunize witnesses called to appear before a regularly convened indicting grand jury. The lower court suggested that the language of the Act indicated that as to grand juries, the power of immunity is available only to those engaged in conducting an investigation, not to those solely concerned, as here, with the finding of indictments. We agree.

In reaching this conclusion, we first note that immunity statutes have historically been considered a prosecutorial "investigative tool." The first federal immunity provision, enacted in 1857, was passed to aid an investigation into a vote selling scheme allegedly occurring in the House of Representatives.[8] Since that time, the underlying premise upon which immunity statutes have

fying should therefore "not [be] lightly created nor expansively construed . . . ." *United States v. Nixon*, 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974). We do not believe, however, that the Fifth Amendment privilege may be subverted by a mechanistic invocation of the grand jury function. Rather, the privilege has traditionally been viewed as "the firmest limitation upon inquisitional power in the grand jury." Rief, *The Grand Jury Witness and Compulsory Testimony Legislation*, 10 Am.Crim.L.Rev. 829, 852 (1972). Nor can it reasonably be argued that the Fifth Amendment privilege is susceptible to the same type of limited breadth given to the amorphous "executive privilege" in *United States v. Nixon, supra.*

8. *See* Comment, *The Federal Witness Immunity Acts In Theory and In Practice: Treading the Constitutional Tightrope*, 72 Yale L.J. 1568, 1571 (1963).

been enacted is their effectiveness in securing prosecutorial information. Restated, it is apparent that immunity statutes were designed to assist in the uncovering of criminal activity, as opposed to simply providing a means whereby sufficient information may be obtained for the prosecution and conviction of an individual offender. *See, e. g., Kastigar v. United States, supra*, 406 U.S. at 446–47 nn. 14–15, 92 S.Ct. 1653. We have no doubt that the Immunity Act of 1968 was passed by the General Assembly to achieve this same purpose.

Turning to the language of the Act, it should first be noted that the title to the Act provides that it is "[a]n Act authorizing courts of record to grant witnesses immunity from prosecution . . . in a proceeding before *certain* grand juries, investigating committees or commissions and courts of record; . . ." (emphasis added). The legislature has specifically provided that "[t]he title and preamble of a statute may be considered in the construction thereof." [9] In the title to the Act, it is clear that the Act is intended to apply only in proceedings before "certain" grand juries. The word "certain" cannot be considered mere surplusage,[10] and must be construed to indicate that not all grand jury proceedings fall within the contemplation of the Act. Moreover, the entire thrust of the Act compels the conclusion that it is primarily intended to assist in the *investigation* of organized crime and racketeering. Such investigations are undertaken not by a regular, indicting grand jury, which functions only to receive complaints and approve indictments, but by a special grand jury convened under a mandate to procure information and make recommendations, or a regular grand jury *specially charged* by a ju-

9. Act of December 6, 1972, P.L. 1339, § 3, 1 Pa.C.S. § 1924 (Supp.1976–77).

10. The Rules of Construction Act provides that ". . . the General Assembly intends the entire statute to be effective and certain." Act of December 6, 1972, P.L. 1339, § 3, 1 Pa.C.S. § 1922(2) (Supp.1976–77).

·dicial authority to investigate a specifically delineated type of widespread criminal activity.[11]

The distinction between the regular grand jury and the latter two categories of "special" grand juries is crucial; the preservation of the distinction assures that the grand jury's investigative powers are employed only in situations where the subject matter of the inquiry is aimed at conditions affecting the members of the community as a whole, and not in instances where the primary target is the individual.[12] The Immunity Act by its express terms is similarly available only in proceedings relating to "organized crime and racketeering." Accepting this view, we then give meaning to the obvious legislative purpose in framing the Immunity Act to provide an effective means for the uncovering of pervasive and systematic criminal activity. We also preserve the delicate balance between the competing rights of the individual and society, by excluding the power to immunize from the arsenal of the prosecutor in his efforts to secure convictions of particular individuals. It is therefore clear that it is only the latter two categories of "spe-

---

11. In *Commonwealth v. McCloskey*, 443 Pa. 117, 277 A.2d 764, *cert. denied*, 404 U.S. 1000, 92 S.Ct. 559, 30 L.Ed.2d 552 (1971), we summarized the requirements for calling an investigating grand jury as follows:

> It has been suggested that the minimum requisites for obtaining a grand jury investigation are: (a) the subject matter of the investigation must affect the members of the community as a whole, rather than as individuals; (b) the investigation must be aimed at conditions and not primarily at individuals; (c) the ordinary processes of the law must be inadequate to cope with the problems; (d) the investigation must have a defined scope, be aimed at crimes, and supported by information indicating the existence of a system of related crimes or a widespread conspiracy; (e) information as to the crimes must come from direct knowledge or a trustworthy source. 443 Pa. at 137, n. 26, 277 A.2d at 774 n. 26.

*See also In re: January, 1974, Philadelphia County Grand Jury Investigation,* 458 Pa. 586, 600, 328 A.2d 485, 492 (1974); *Commonwealth ex rel. Camelot Detective Agency, Inc. v. Specter,* 451 Pa. 370, 374, 303 A.2d 203, 205 (1973); *McNair's Petition,* 324 Pa. 48, 61–62, 187 A. 498, 504–05 (1936).

12. *See* cases cited in note 11 *supra*.

cial" grand juries to which the Immunity Act was intended to apply, and the record adequately demonstrates that the Bucks County Grand Jury in the instant case was not clothed with special investigative authority.

The conclusion that the Immunity Act applies only to investigating grand juries is further supported by other language contained in that provision. Section 2 provides for a grant of immunity upon petition by the Attorney General, and requires that "[s]uch petition shall set forth *the nature of the investigation* and the need for the immunization of the witness." Act of November 22, 1968, § 2, 19 P.S. § 640.2 (Supp.1975–76) (emphasis added). This language clearly demonstrates that the Act is intended to be operative only to aid an "investigation", such as that undertaken by the two types of investigating grand juries delineated above. The legislature obviously did not intend to confer upon the Attorney General the power to immunize witnesses in all grand jury proceedings; such unlimited authority would undoubtedly subvert the fine balance between the rights protected by the Fifth Amendment and the power of the government to obtain testimony. We believe that the legislature specifically intended to avoid such a result, and did so by proscribing the power to immunize in proceedings before a regular, indicting grand jury, like that in the case presently at bar.

### III.

An alternative ground for our holding also requires consideration, however, since it is our view that absent an allegation of conspiracy, the power to obtain a grant of immunity is not available under the Act.

Section 1 of the Immunity Act sets forth the circumstances under which a court may order a witness to testify, specifically limiting such authority to proceedings

"relating to organized crime or racketeering." [13]  In addition, this Court has previously stated that "[u]nder the Act, a court may grant immunity to a witness and order him to testify only if the proceeding in which his testimony is sought relates to 'organized crime or racketeering.' " *In re Salvatore LaRussa*, 464 Pa. 86, 89, 346 A. 2d 32, 34 (1975).  There terms are defined in Section 6 of the Act as follows:

> "Organized crime" and "racketeering" shall include, but not be limited to, conspiracy to commit murder, bribery or extortion, narcotic or dangerous drug violations, prostitution, usury, subornation of perjury and lottery, bookmaking or other forms of organized gambling.

Act of November 22, 1968, § 6, 19 P.S. § 640.6 (Supp. 1975–76).

Both the trial court and the Superior Court construed the words "conspiracy to commit" in Section 6 to modify each of the substantive crimes following thereafter. Since the conspiracy charge against both defendants had been withdrawn, it was concluded that under the statutory definition, the grand jury proceeding did not relate to "organized crime or racketeering", and the court was therefore without authority to grant immunity.  We believe that the courts below correctly interpreted this language of the Act.

The Commonwealth argues that the lower courts erred in holding that the words "conspiracy to commit" in Sec-

---

13.  Section 1 provides in full as follows:
  If, in a proceeding relating to organized crime or racketeering before a court, grand jury or investigating body set up by legislative enactment or by order of the Governor, any person shall refuse to testify or to produce evidence of any other kind on the ground that his testimony or evidence may tend to incriminate him, that person may be ordered to give such testimony.  The order to testify shall not be given except upon the order of court after a hearing in which the attorney general has established a need for the grant of immunity, as hereinafter provided.  Act of November 22, 1968, § 1, 19 P.S. § 640.1 (Supp.1975–76).

tion 6 of the Act modified each of the substantive crimes following thereafter, contending instead that these words should be construed to modify only the substantive crime of murder. To support its contention, the Commonwealth asserts that each substantive offense listed in Section 6 should be considered the food upon which organized crime feeds, and that the legislature must have intended the Act to become operative whenever a crime of that nature was involved. Thus, it is suggested that the language "conspiracy to commit" should be interpreted to modify only murder in order to achieve the purpose of reaching this class of criminal activity.

Such a construction, however, not only vitiates the natural and nontechnical word arrangement employed by the legislature in Section 6, but it disregards an obvious legislative intention to reach the vast network of well conceived criminal ventures undertaken by those involved in organized crime. It is obvious that the legislature did not intend the Act to be operative to reach the criminal activity of one individual acting alone.[14] Rather, the Act unquestionably addresses itself to the concerted action of organized criminal activity.[15] It has long

14. I cannot believe that "prostitution," for example in this context would include the sad soul who attempts to earn some money for herself alone but . . . only "prostitution" when it is an integral part of "organized crime" and "racketeering." *Commonwealth v. Kolakowski*, 55 Erie L.J. 21, 24 (1972).

15. It should be noted that the original draft of the Immunity Act as introduced in the Senate provided for the granting of immunity ". . . in any proceeding . . . to any person." S.B. 1507, 1968 Sess., May 22, 1968. Upon consideration in the House, this provision was amended, with Senate concurrence, to strike out "any proceeding" and replace in its stead the phrase "a proceeding relating to organized crime or racketeering." The purpose of the amendment, according to its author, Representative Caputo, was to "provide certain safeguards to the citizens of this Commonwealth." Pa.Leg.J. (House), p. 1658 (1968). Undoubtedly, the primary "safeguard" was the elimination of the wide open investigations which could have resulted from the broad language of the original bill. On the basis of this history, it is abundantly clear that the legislature was concerned with restricting the scope of the Immunity Act only to investigations concerning organized criminal activity.

been recognized that "[a]n unlawful act may not prove injurious . . . when attempted by an individual, and may be readily prevented; the same act attempted by the confederation of two or more may become dangerous to the public peace and to the security of persons and property, and harmful to the public morals by the very weight and power of numbers." *Fimara v. Garner*, 86 Conn. 434, 437–38, 85 A. 670, 672 (1913); *See also, United States v. Rabinowich*, 238 U.S. 78, 35 S.Ct. 682, 59 L.Ed. 1211 (1915). The substantive crimes listed in Section 6 may or may not be the product of organized crime. Rather, we are inclined to believe that it is when such acts are the end product of an "unlawful agreement" that constitute the evil sought to be eradicated by the legislature. Thus, on the basis of the obvious legislative intention to reach organized, concerted activity, and the plain meaning of the language of Section 6, it is clear that before the authority to confer immunity arises under the Act, there must be a conspiracy to commit any of the substantive offenses as set forth in Section 6.

The Commonwealth also asserts, however, that the language of Section 6 "shall include, but not be limited to," implies that the legislature must have intended to reach the substantive offenses as well, including others not specifically enumerated in the Act. We agree that the legislature may have foreseen that it could not specifically identify all substantive offenses relating to organized crime, and we therefore agree that the legislature did not limit the Acts applicability to conspiracies to commit only the enumerated crimes. However, we also believe that the legislature intended only to provide sufficient latitude to reach *conspiracies* for any such unenumerated offenses relating to organized crime.[16] We therefore cannot accept the Commonwealth's assertion that this

16. For instance, while blackmail is not specifically enumerated in Section 6 of the Act, it seems evident that a conspiracy to commit blackmail would fall within the scope of the Act as relating to "organized crime and racketeering."

language indicates a legislative intention to reach something less than concerted activity.

The Commonwealth also argues that the Immunity Act should be read in *pari materia* with the subsequently enacted Corrupt Organizations Act of 1970, 18 Pa.C.S. § 911 (1973). That Act imposes criminal penalties and civil liability on anyone who receives benefit, pecuniary or otherwise, from a "pattern of racketeering activity." Its primary purpose is, through the use of civil remedies of the type traditionally employed against antitrust violators, to prevent the infiltration of legitimate business enterprises by organized crime.[17] The Commonwealth contends that the definition of "racketeering activity" in the Corrupt Organizations Act should be incorporated into the Immunity Act. Subsection (h) of the Corrupt Organizations Act defines "racketeering activity" as follows:

(i) any act which is indictable under any of the following provisions of this title:

Chapter 25 (relating to criminal homicide)

Section 2706 (relating to terroristic threats)

Chapter 29 (relating to kidnapping)

Chapter 33 (relating to arson, etc.)

Chapter 37 (relating to robbery)

Chapter 39 (relating to theft and related offenses)

Section 4108 (relating to commercial bribery and breach of duty to act disinterestedly)

Section 4109 (relating to rigging publicly exhibited contest)

Chapter 47 (relating to bribery and corrupt influence)

---

17. The Pennsylvania Corrupt Organizations Act of 1970 was copied almost verbatim from Title IX of the Organized Crime Control Act of 1970, 18 U.S.C. §§ 1961–68 (1970). *See* Comment, *Organized Crime and the Infiltration of Legitimate Business: Civil Remedies for "Criminal Activity,"* 124 U.Pa.L.Rev. 192, 197 n. 28 (1975).

Chapter 49 (relating to perjury and other falsification in official matters)

Section 5512 through 5514 (relating to gambling)

Chapter 59 (relating to public indecency)

(ii) any offense indictable under section 20(d) of the act of September 26, 1961 (P.L. 1664), known as 'The Drug, Device and Cosmetic Act' (relating to the sale and dispensing of narcotic drugs) ;

(iii) any conspiracy to commit any of the offenses set forth in subclauses (i) and (ii) of this clause; or

(iv) the collection of any money or other property in full or partial satisfaction of a debt which arose as the result of the lending of money or other property at a rate of interest exceeding 25% per annum or the equivalent rate for a longer or shorter period, where not otherwise authorized by law. . . . ` 18 Pa.C. S. § 911(h) (1973).

At the outset, we must note that the Commonwealth urges upon us a technique of statutory construction unknown to the law of this jurisdiction—that is, definition by reference to *subsequent* legislation. Section 1921(c) of the Rules of Construction Act clearly provides:

(c) When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters:

(1) The occasion and necessity for the statute.

(2) The circumstances under which it was enacted.

(3) The mischief to be remedied.

(4) The object to be attained.

(5) *The former law, if any, including other statutes upon the same or similar subjects.*

(6) The consequences of a particular interpretation.

(7) The contemporaneous legislative history.

(8) Legislative and administrative interpretations of such statute.

Act of December 6, 1972, P.L. 1339, § 3, 1 Pa.C.S. § 1921(c) (Supp.1976–77) (emphasis added).

Here, the legislature has specifically provided that former law on similar subjects may be used as an aid to construction, while never mentioning the possibility of so employing subsequently enacted legislation. Thus, reference to the Corrupt Organizations Act of 1970 to interpret the previously enacted Immunity Act would clearly be improper.

However, even if we assume for purposes of argument that reference to subsequent legislation is a valid interpretive technique, the Corrupt Organizations Act of 1970 does not support the Commonwealth's contention, but refutes it. First, the 1970 Act defines "racketeering activity" as set forth above, which definition includes the substantive offense of "criminal homicide." We note that the Commonwealth would concede, under its interpretation of the language, that the Immunity Act would not apply to a criminal homicide where no conspiracy was alleged. Therefore, the application to the Immunity Act of the definition of "racketeering activity" set forth in the Corrupt Organizations Act of 1970 would artificially broaden the Immunity Act's scope far beyond that provided by its express language. We do not believe that the legislature intended such a result.

Second, subsection (g) of the Corrupt Organizations Act, entitled "Immunity," incorporates by reference the Immunity Act of 1968. However, by its terms, subsection (g) permits a grant of immunity only "[w]henever any individual refuses, on the basis of his privilege against self-incrimination, to comply with a civil investigative demand issued pursuant to subsection (f) of this section or to testify or produce other information in any proceeding under subsection (d) [Civil Remedies] of this section." 18 Pa.C.S. § 911(g) (1973). The Immunity

Act is thus incorporated by reference to apply only to civil proceedings.[18] It seems unlikely that the legislature would have confined the Immunity Act's application solely to civil proceedings under the Corrupt Organizations Act if the interpretation urged upon us by the Commonwealth was correct. Indeed, the civil—criminal distinction in the Corrupt Organizations Act would have been unnecessary if the legislature had vested the Attorney General with the power to petition for an immunity award in all proceedings. In light of these considerations, it is clear that any effort to define the language of the Immunity Act by reference to the Corrupt Organizations Act of 1970 would be inappropriate and beyond the bounds of reasonable judicial construction. An accurate interpretation of the Immunity Act requires that we confine our examination to the express language employed by the legislature in that enactment alone, and that language clearly requires that a conspiracy be alleged before authority to grant immunity under the Act is conferred.

Finally, it is argued that our construction of the Immunity Act today is in conflict with this Court's recent decision in *In re Falone*, 464 Pa. 42, 346 A.2d 9 (1975). We, however, see no such contradiction. In *Falone, supra*, this Court upheld a judgment of contempt entered against a witness who refused to testify before the January, 1974, Special Investigating Grand Jury of Philadelphia, despite a grant of immunity. The proceeding in-

18. It is clear that the legislature utilized civil proceedings in the Corrupt Organizations Act in order to deal with the problem of organized crime without being burdened by the strict requirements of criminal procedure.
   One feature of the legislation is that by treating violations as civil questions, it lessens the burden of proof, simplifies legal procedures, and affords the government broader rights of pre-trial discovery.
Pennsylvania Crime Commission, Report on Organized Crime 93 (1970). The privilege against self incrimination is an "essential mainstay" of our criminal procedure, *Malloy v. Hogan*, 378 U.S. 1, 7, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), which cannot be diluted by a strained reference to a statute emphasizing non-criminal remedies and procedures.

volved in *Falone* was an investigating and not an indicting grand jury. Moreover, the opinion in that case clearly referred to the fact of the Attorney General's allegation that Falone had "conspired with other organized crime figures to make payments of money to members of the Philadelphia Police Department for the purpose of influencing them in the performance of their official duties." 464 Pa. at 55, n. 17, 346 A.2d at 16, n. 17. Since the facts in *Falone* are clearly in line with our present holding, any language in that opinion indicating that immunity may be granted absent an allegation of conspiracy must be regarded as surplusage.

Order of the Superior Court Affirmed.

MANDERINO, J., filed a concurring opinion.

ROBERTS, J., filed a dissenting opinion, in which O'BRIEN and POMEROY, JJ., joined.

MANDERINO, Justice, concurring.

I join in the opinion of Mr. Justice Nix. In doing so, I am assuming for the purposes of this case only that the Act of November 22, 1968, P.L. 1080, 19 P.S. § 640.1, et seq. (Supp.1975-76), referred to as the Immunity Act, is not in violation of the Pennsylvania Constitution. I make the assumption because the appellants have raised no issue concerning the constitutionality of the Act. Under the Immunity Act ancient modes of extracting statements from people are replaced with coercion by incarceration. A witness testifying against an accused to avoid incarceration presents the same potential for perjury as a witness whose testimony is secured by use of the rack, the turning of the screw, or the payment of a monetary bribe. Using this kind of testimony to convict an accused raises serious due process questions. For this reason I wish to reserve judgment concerning whether the Act violates the Pennsylvania Constitution.

**438**

ROBERTS, Justice, dissenting.

In recognition of the dangers presented by organized crime and racketeering and the attendant danger of governmental corruption, the Legislature enacted the Immunity Act[1] to assist law enforcement officials in their efforts to fight organized crime. The majority holds that the Immunity Act is inapplicable to proceedings before an indicting grand jury, and is inapplicable to investigations into bribery and extortion unless conspiracy to commit these crimes is alleged. There is no justification for such an interpretation of the Act; it serves only to obstruct prosecution of organized crime and corruption.

Today's decision denies the Attorney General the power to use the Immunity Act to obtain testimony necessary for the prosecution of two public officials accused of extortion. The prosecution began with the filing of a criminal complaint, in August 1972, charging that Warren Brady and Henry George, Bensalem Township supervisors, had committed "extortion, prohibited acts by public officers, and conspiracy." Specifically, the complaint alleged that the two supervisors had extorted money and property from two construction contractors, Joseph D'Egidio and John Camerlengo, in return for subdivision approvals and zoning changes. The conspiracy charges were dropped after a preliminary hearing, but the Commonwealth made out a prima facie case on the other charges. When these charges were presented before an indicting grand jury, D'Egidio and Camerlengo invoked the privilege against self-incrimination and refused to testify. The Attorney General, pursuant to the Immunity Act, then petitioned the court of common pleas for an order immunizing the two witnesses and compelling them to testify.

The court of common pleas dismissed the petition, ruling that the proceeding was not within the scope of the

1. Act of November 22, 1968, P.L. 1080 §§ 1 et seq., 19 P.S. §§ 640.1 et seq. (Supp.1976).

Immunity Act because it involved an indicting, as opposed to an investigating grand jury. As an alternative holding, the court held that the Immunity Act was not applicable because the Commonwealth was no longer alleging a conspiracy. The Superior Court affirmed in a three judge per curiam opinion (Wright, P. J., and Spaulding, J., not participating). *Commonwealth v. Brady*, 228 Pa.Super. 233, 323 A.2d 866 (1974). Judge Cercone filed a dissenting opinion, which was joined by Judge Spaeth.

The majority today follows the interpretation of the Immunity Act adopted by the court of common pleas. I believe that such an unnecessarily restrictive interpretation is contrary to the text of the Immunity Act and inconsistent with the Legislature's intention that the Immunity Act provide a means of obtaining testimony against organized crime and racketeering. I dissent.

## I.

### The Immunity Act Applies to Proceedings Before Indicting Grand Juries

The majority first decides that the Immunity Act may not be used to immunize witnesses called before an indicting grand jury. Section 1 of the Immunity Act provides that a witness may be ordered to testify:

". . . in a proceeding relating to organized crime or racketeering before a court, grand jury or investigating body set up by legislative enactment or by order of the Governor . . .." [2]

This provision, by its terms, applies to grand juries, and makes no distinction between investigating and indicting grand juries. The majority ignores the express language of this provision, however, and instead construes the title of the Immunity Act to limit its application to proceedings before investigating grand juries.

2. Id. § 640.1.

There is no justification for interpreting a statute solely on the basis of its title, without considering its text. The Statutory Construction Act of 1972 provides that "[t]he title and preamble of a statute may be considered in the construction thereof." [3] Thus, reference to the title is permissible in order to interpret the text of a statute. The majority's use of the title to reach a result at odds with the text of the statute is indefensible.

The majority's interpretation also contravenes the purpose of the Immunity Act: to promote the prosecution of organized crime and racketeering. I cannot agree with the majority that the only purpose of the Immunity Act is investigation.[4]

Indeed, the Immunity Act applies "in a proceeding relating to organized crime or racketeering before a court . . . ." [5] Ordinarily, courts are engaged in adjudication, not investigation. When the Act provides that a witness must "testify or . . . produce evidence" "before a court," it is clear that the Act contemplates the use of this immunized testimony in criminal prosecution, not just investigation.[6]

As defined, "organized crime" and "racketeering" refer to crimes which present a serious danger to the public welfare and which, by their very nature, excape prosecution if the Commonwealth is limited to ordinary law enforcement techniques.[7] Immunity has long been recog-

---

3. Act of December 6, 1972, P.L. 1339 § 3, 1 Pa.C.S.A. § 1924 (Supp.1976).

4. The majority states that the Act "is primarily intended to assist in the investigation of organized crime and racketeering," (emphasis deleted), but proceeds to interpret the statute as if investigation were its only purpose. Even if investigation is the statute's primary purpose, there is no justification for interpreting the statute to frustrate its other purposes. A statute must be interpreted, if possible, so as to effectuate all of its purposes.

5. 19 P.S. § 640.1 (Supp.1976).

6. Id.

7. "As used in this act—
'Organized crime' and 'racketeering' shall include, but not be limited to, conspiracy to commit murder, bribery or extortion,

nized as a useful tool for gathering evidence against such criminal activity. Thus, the purposes of the Act are not limited to the gathering of information for the further edification of the public about the threat of organized crime and racketeering. Rather, its purposes include prosecution.[8]

The majority asserts that " . . . immunity statutes [are] designed to assist in the uncovering of criminal activity, as opposed to simply providing a means whereby sufficient information may be obtained for the prosecution and conviction of an individual offender." If by this statement the majority means that immunity statutes were aimed only at discovering crimes, not at producing testimony for the prosecution of crime, the proposition is belied by the very source relied on by the majority. *Kastigar v. United States*, 406 U.S. 441, 446 n. 14, 92 S.Ct. 1653, 1657 n. 14, 32 L.Ed.2d 212 (1972), points out that some of the earliest immunity legislation was enacted in order to obtain testimony at particular trials.

Thus, far from reaching the result specifically intended by the Legislature, the majority appears to have frustrated the purpose of the Legislature by preventing the use of immunity in the situation most clearly contemplat-

---

narcotic or dangerous drug violations, prostitution, usury, subornation of perjury and lottery, bookmaking or other forms of organized gambling."
19 P.S. § 640.6 (Supp.1976).

8. "When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters:
(1) The occasion and necessity for the statute.
(2) The circumstances under which it was enacted.
(3) The mischief to be remedied.
. . . . . "
1 Pa.C.S.A. § 1921 (Supp.1976). I believe that the language of the statute is explicit. The majority has manufactured an ambiguity by looking at the title instead of the statute itself. Since the majority's construction of the statute does not follow from the explicit language of the statute, it should consider the legislative purpose of facilitating prosecution of organized crime before adopting its construction of the statute.

442

ed by the Legislature: in the prosecution of organized crime and racketeering.

Finally, the language of the title itself does not support the majority's conclusion. The title reads:

"An Act authorizing courts of record to grant witnesses immunity from prosecution for or on account of any matter or thing concerning which they were ordered to testify in a proceeding before certain grand juries, investigating committees or commissions and courts of record; making the refusal to testify after such immunity criminal contempt and providing penalties." [9]

The majority reads the words "certain grand juries" to mean investigating grand juries, reasoning that the word certain cannot be surplusage. Although the Immunity Act does not apply to all grand juries, reference to the text of the statute itself makes clear that it applies to this proceeding. The limitations referred to by the word "certain" in the title are not those created by the majority. The Act provides that a grant of immunity may be given in "a proceeding relating to organized crime" and only when "the attorney general has established a need for the grant of immunity . . . ." [10] Thus the Act applies only to grand jury proceedings, like the proceedings in this case, which meet these conditions. Since the title does not refer to organized crime or racketeering, or the requirement that need for a grant of immunity be established, the most reasonable interpretation is that the word "certain" refers to these requirements. Moreover, the title itself refers to "investigating committees." If the Legislature intended to limit the Act's applicability to investigating grand juries, it would not have drafted the title to read "certain grand juries," but would have

9. 19 P.S. § 640.1, Annot. (Supp.1976).

10. Id. § 640.1.

used the words "investigating grand juries," just as it used the words "investigating committees." [11]

The Legislature adopts the title of a statute as a convenient label for referring to the enactment. While the title may shed some light on legislative purpose, it is not intended to catalogue every situation in which the statute might apply, or to expressly limit its applicability.[12] When the Legislature enacted the Immunity Act, it saw the need not just to investigate, but to eradicate, organized crime and racketeering. The majority's use of the title to the Immunity Act to limit its applicability to investigating grand juries violates the most basic rule of statutory interpretation: "[T]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." [13]

11. It also appears from a reading of the title that the word certain is intended to modify the words "grand juries, investigating committees or commissions and courts of record," not just the words "grand juries." 19 P.S. § 640.1, Annot. (Supp.1976). If the word certain refers to the limitation to proceedings relating to organized crime, and modifies all of the bodies or tribunals listed in the title, then the title clearly reflects the provisions of the statute itself. If the word "certain" means "investigating," however, as the majority asserts, the words "certain . . . investigating committees" would mean "investigating . . . investigating committees." The word "certain" would be surplusage.

12. In *United States v. Campanale*, 518 F.2d 352 (9th Cir. 1975), cert. denied, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976), the Ninth Circuit rejected an argument that the Organized Crime Control Act of 1970, 18 U.S.C.A. §§ 1961 et seq. (Supp.1976), applies only to those engaged in large-scale "organized crime:"

"There is no doubt that Congress was concerned with organized crime in passing this amendment to the Hobbs Act. The official short title of the statute evidences this concern. But quite obviously Congress focused on some of the kinds of activities by which individuals and associations engaged in organized crime maintained their income or influence. The statute makes unlawful such activities no matter who engages therein."

Id. at 363. (citation omitted).

13. 1 Pa.C.S.A. § 1921 (Supp.1976).

## II.

### The Immunity Act Applies to Proceedings Relating to Bribery or Extortion

As an alternative holding, the majority decides that the Immunity Act cannot be invoked absent an allegation of conspiracy. Section I of the Act authorizes a grant of immunity "in a proceeding relating to organized crime or racketeering." [14] Section 6 of the Act provides:

"As used in this act—

'Organized crime' and 'racketeering' shall include, but not be limited to, conspiracy to commit murder, bribery, or extortion, narcotic or dangerous drug violations, prostitution, usury, subornation of perjury and lottery, bookmaking or other forms of organized gambling." [15]

The majority reads the words "conspiracy to commit" in Section 6 to modify each of the substantive crimes listed. It reasons that only conspiracies to commit the crimes listed in Section 6 and conspiracies to commit similar crimes constitute "organized crime or racketeering." Because the conspiracy charges against both Brady and George were withdrawn, the majority concludes that the grand jury proceeding did not relate to "organized crime or racketeeting" and holds that the court of common pleas was without authority to grant immunity.[16] I cannot agree.

14. 19 P.S. § 640.1 (Supp.1976).

15. Id. § 640.6 (Supp.1976).

16. Basing today's decision on the fact that the conspiracy charges were withdrawn creates an absurd result. The original complaint charged conspiracy, and a grant of immunity therefore could have been given before the conspiracy charge was dropped. Indeed, immunity can be granted even before a complaint is filed. In *In re Falone*, 464 Pa. 42, 346 A.2d 9 (1975), the allegation of conspiracy was contained in the Attorney General's petition for a grant of immunity, and the majority states that this was sufficient. Consequently, the request for immunity in this case is being denied merely because the request was filed at a later stage in the proceedings.

My disagreement with the majority's interpretation is compelled by four factors: (1) the arrangement of the words of Section 6; (2) the nature of the problem which the Legislature addressed; (3) the broad language of the Act; and (4) a subsequent enactment of the Legislature defining the term "racketeering."

## A.

I reject the majority's assertion that its construction of the Act follows naturally from the arrangement of the words in Section 6. On the contrary, a textual analysis of the section yields the conclusion that the words "conspiracy to commit" modify only the following word: "murder." The arrangement of the words provides no indication that the phrase "conspiracy to commit" modifies every word that follows. It requires a strained construction to conclude that the eleven crimes listed, which are connected by four conjunctions, are all modified by the phrase "conspiracy to commit." By contrast, the words "shall include," are words which normally serve to alert the reader that a list follows. Thus, the natural arrangement of the words in Section 6 indicates that the list of crimes which constitute organized crime or racketeering begins after the words "shall include, but not be limited to," and that "conspiracy to commit," modifies only "murder."

Moreover, the majority's interpretation injects an ambiguity into Section 6. The crimes, or groups of crimes (e. g., "bribery or extortion"), listed in Section 6 are connected by the conjunction "and." (i. e., ". . . subornation of perjury *and* lottery, bookmaking or other forms of organized gambling.") When the phrase "conspiracy to commit" modifies two or more crimes connected by the conjunction "and," this denotes a single conspiracy encompassing multiple objectives. For example, the words "conspiracy to commit murder and robbery" imply a single criminal scheme, having as its objectives

both murder and robbery. If the phrase "conspiracy to commit" modifies all the crimes listed in Section 6, this would mean that a petition for a grant of immunity must allege a single conspiracy having the objectives of murder, prostitution, usury, subornation of perjury, and at least four other crimes. Although the majority does not claim that such a multifarious conspiracy need be alleged, this conclusion would apparently follow from the majority's interpretation of the statute.

In short, the majority's interpretation does not follow from a straightforward interpretation of the statute. The most plausible interpretation is that suggested by the Commonwealth: that the phrase "conspiracy to commit" modifies only the crime of "murder." If anything, it is the majority's interpretation, not the Commonwealth's, that "vitiates the natural and nontechnical word arrangement employed by the legislature."

### B.

The conclusion that the phrase "conspiracy to commit" modifies only the crime of murder is supported by an examination of the nature of the crimes listed in Section 6 in light of the purposes of the Immunity Act. The Legislature specifically addressed itself to the problem of organized crime. Of the substantive crimes listed in Section 6 of the Act, only murder can be performed by an individual acting by himself. All of the others require two or more persons for the substantive violation to be consummated. A murder committed by an individual acting completely by himself is simply not a proper case to be investigated by the use of grants of immunity. The only person who could claim immunity with regard to the murder under investigation would be the killer. The Legislature intended to reach those crimes which are committed by at least two people and, commonly, by organized criminals. This includes conspiracy to commit murder, and the other substantive crimes listed that en-

able organized crime to exist and flourish: corruption of public officials, corruption of the means by which crime is fought, and the crimes which pay for it all—extortion, prostitution, gambling, and the drug trade. For this reason, I am of the view that the other listed crimes were intended by the Legislature to be included within "organized crime or racketeering," not only conspiracies to commit these crimes.[17]

17. The majority relies on a statement made by Representative Caputo on the House floor in support of its interpretation of the Immunity Act. This court has determined, however, that statements made on the floor of the House or Senate should not be relied on in formulating legislative intent. *Commonwealth v. Alcoa Properties, Inc.*, 440 Pa. 42, 269 A.2d 748 (1970); *Martin's Estate*, 365 Pa. 280, 74 A.2d 120 (1950); *National Transit Co. v. Boardman*, 328 Pa. 450, 197 A. 239 (1938). Moreover, such statements ". . . can be so ambiguous as to cause confusion rather than clarification." *Commonwealth v. Alcoa Properties, Inc.*, supra at 46, 269 A.2d at 749, a problem amply illustrated by the majority's use of Representative Caputo's statement.

Representative Caputo introduced a group of amendments, including the Immunity Act's requirement that immunity be granted only "after a hearing in which the attorney general has established a need for the grant of immunity." Pa.Leg.J. (House), at 1658 (1969); 19 P.S. § 640.1 (Supp.1976). This Court recognized the significance of this requirement in *In re Falone*, supra:

"The Legislature recognized that a grant of immunity is an extraordinary benefit conferred on the witness. The public interest is usually best served by prosecuting persons guilty of crime, but in certain limited circumstances the public interest may require the conferral of that benefit in return for disclosure of information in the witness' possession. The Legislature was not satisfied to entrust the determination that those limited circumstances exist to law enforcement officials alone. Therefore, the Act provides that the Attorney General's decision that immunization is necessary is subject to approval of the court."

464 Pa. at 42, 346 A.2d at 9. Thus, when Representative Caputo stated that the amendments were to "provide certain safeguards to the citizens of this Commonwealth," Pa.Leg.J. (House) at 1658 (1968), he probably was referring to the need to insure that criminals are not immunized from prosecution except when a court agrees with the Attorney General that it is more important to obtain their testimony. Both the limitation to proceedings relating to organized crime and racketeering, and the requirement that a need for the grant of immunity be established, are consistent with this interpretation.

I find it particularly hard to believe that the Legislature did not intend the Immunity Act to apply in proceedings relating to "organized gambling." Yet the construction adopted by the majority makes the statute applicable only to cases involving conspiracy to commit organized gambling. If gambling is organized, this implies the existence of a conspiracy. In effect, the majority's construction requires the Commonwealth to allege a conspiracy to enter into a conspiracy.

## C.

The interpretation of the Act adopted by the majority fails to give effect to the broad language used by the Legislature in drafting the Immunity Act. It is apparent that the Legislature intended to sweep broadly with the Act. In Section 1, the Act provides that immunity may be granted in proceedings before courts, grand juries, legislative investigative bodies, and executive investigative bodies conducting inquiries *"relating to* organized crime or racketeering." [18] The nature of this relation is in no way restricted. It may include the causes, operations, beginnings, effects or scope of organized crime or racketeering. I cannot agree with the majority that the bribery of public officials, and extortion by public officials, do not "relate to" organized crime or racketeering in one or more of the ways enumerated above.

The majority also fails to give the proper effect to the language in Section 6 of the Act which defines organized crime and racketeering to include "but not be limited to" [19] the enumerated crimes. Again, the Legislature chose broad language seeking to avoid the possibility of a technical construction which would allow an aspect of organized crime, or a matter relating to organized crime, to escape scrutiny. The majority's narrow reading of

18. 19 P.S. § 640.6.

19. Id. § 640.6.

the Immunity Act is contrary to the broad language of the Act itself.

## D.

The Commonwealth's interpretation of the Immunity Act is supported by other legislation dealing with organized crime and racketeering. The Corrupt Organizations Act of 1970[20] was enacted to prevent those who procure wealth and influence through "racketeering activities" from utilizing that wealth and influence to obtain control over legitimate enterprises. As such it is clearly in "pari materia" with the Immunity Act; the two statutes both relate to the control of organized crime and racketeering.[21] Since the Immunity Act and the Corrupt

---

20. Act of December 8, 1970, P.L. 874 §§ 1 et seq., repealed and reenacted, Act of December 6, 1972, P.L. 1482 § 1, 18 Pa.C.S.A. § 911 (1973).

21. "Statutes or parts of statutes are in pari materia when they relate to the same persons or things or to the same class of persons or things." 1 Pa.C.S.A. § 1932(a) (Supp.1976).

   The majority states that the Corrupt Organizations Act emphasizes civil remedies, but that is no reason to decide that the Corrupt Organizations Act and the Immunity Act are not in pari materia. Both deal with the same subject: organized crime and racketeering.

   The majority's statement that the privilege against self-incrimination cannot be diluted by a reference to a statute emphasizing noncriminal remedies and procedures reflects a complete misunderstanding of the privilege. "It . . . is the danger of formal imposition of *legal criminal liability* against which the privilege protects." J. McCormack, Evidence § 121 at 256 (2d ed. 1972). Thus, the availability of the privilege depends on the possibility that the witness may be subject to criminal prosecution; it does not depend on the particular proceeding before which the witness is called to testify. See id. §§ 135, 143. The distinction between a grand jury investigation and a civil proceeding pursuant to the Corrupt Organizations Act, relates only to the kind of proceeding in which the witness testifies, not to the possibility of any subsequent prosecution. To distinguish the provision for immunity made in the Corrupt Organizations Act because the Act emphasizes civil remedies is to make a distinction without a difference.

   Moreover, the Corrupt Organizations Act is not limited to civil remedies. It defines criminal offenses which constitute felonies of the first degree, and apply independently of the Act's civil remedies. 18 Pa.C.S.A. §§ 911(b)–(c) (1973). These offenses all

Organizations Act are in pari materia, we must construe the two statutes together.[22] Since the two statutes have common objectives, and the Legislature anticipated that the Immunity Act would be used to aid enforcement of the Corrupt Organizations Act, it is both possible and desirable to construe the Immunity Act in light of the Corrupt Organizations Act.[23]

relate to organized crime and racketeering. Therefore, the Immunity Act should be construed together with the Corrupt Organizations Act so that the power to grant immunity is available when these crimes are prosecuted.

22. "Statutes in pari materia shall be construed together, if possible, as one statute. 1 Pa.C.S.A. § 1932(b) (Supp.1976).
The majority simply ignores this provision of the Statutory Construction Act of 1972. Even if this provision did not exist, however, it would not follow, as the majority asserts, that it is improper to consider the Corrupt Organizations Act in construing the Immunity Act. The section of the Statutory Construction Act relied on by the majority provides:
"When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters:
. . . . . . . . . .
(5) The former law, if any, including other statutes upon the same or similar subjects.
. . . . . . . . . .
(8) Legislative and administrative interpretations of such statute."
Id. § 1921(c) (Supp.1976). The majority's reliance on this provision is unfounded. First, since the Legislature's intent may be determined by considering these factors "among other matters" it is clear that this list is not intended to be exclusive. Just because this subsection provides for consideration of prior legislation does not mean that subsequent legislation cannot be considered as well. Second, the Immunity Act is incorporated by reference in the Corrupt Organizations Act. Since that incorporation reflects the Legislature's understanding of the Immunity Act, it can be thought of as a "Legislative interpretation" of the Immunity Act.

23. As the majority points out, the Corrupt Organizations Act defines racketeering to include "criminal homicide," 18 P.S. § 911(h)(1)(i) (1973), and the Immunity Act applies to "conspiracy to commit murder." 19 P.S. § 640.6 (Supp.1976). This apparent contradiction, however, is no reason to ignore the Corrupt Organizations Act in construing the Immunity Act. The statutory Construction Act provides that "Statutes in pari materia shall be construed together, if possible, as one statute." 1 Pa.C.S.A. § 1932(b) (Supp.1976). The better interpretation of this subsection, and of the Statutory Construction Act as a whole, is that if two

Subsection (h) of the Corrupt Organizations Act specifically enumerates those crimes which are included within the term "racketeering activity:"

" 'Racketeering activity' means:

(i) any act which is indictable under any of the following provisions of this title:

Chapter 25 (relating to crime homicide)

Section 2706 (relating to terroristic threats)

Chapter 29 (relating to kidnapping)

Chapter 33 (relating to arson, etc.)

Chapter 37 (relating to robbery)

Chapter 39 (relating to theft and related offenses)

Section 4108 (relating to commercial bribery and breach of duty to act disinterestedly)

Section 4109 (relating to rigging publicly exhibited contest)

Chapter 47 (relating to bribery and corrupt influence)

Chapter 49 (relating to perjury and other falsification in official matters)

Section 5512 through 5514 (relating to gambling)

Chapter 59 (relating to public indecency)

(ii) any offense indictable under section 20(d) of the act of September 26, 1961 (P.L. 1664), known as 'The Drug, Device and Cosmetic Act' (relating to the sale and dispensing of narcotic drugs);

(iii) any conspiracy to commit any of the offenses set forth in subclauses (i) and (ii) of this clause; or

statutes in pari materia cannot be treated as one statute for all purposes, they still should be treated together to the extent possible. The objective of statutory interpretation still should be to "effectuate the intention of the General Assembly." Id. § 1921(a) (Supp.1976). Thus, when two statutes deal with the same subject, they should be considered together so as to effectuate the purposes of both statutes.

(iv) the collection of any money or other property in full or partial satisfaction of a debt which arose as the result of the lending of money or other property at a rate of interest exceeding 25% per annum or the equivalent rate for a longer or shorter period, where not otherwise authorized by law. . . ."

Thus, the Corrupt Organizations Act, with its broad definition of racketeering activities, includes all of the listed crimes regardless whether a conspiracy is alleged. Because this Act and the Immunity Act should be construed together, this Court should not artificially restrict the definitions found in the Immunity Act.

To do otherwise creates an anomalous situation. The Corrupt Organizations Act contains an immunity provision which adopts by reference the Immunity Act and extends its application to civil proceedings when there is a pattern of "racketeering." [24]  There is no requirement

---

**24.** The majority asserts "that the legislature . . . confined the Immunity Act's application solely to civil proceedings under the Corrupt Organizations Act . . . ." I cannot agree. Subsection (g) of the Corrupt Organizations Act provides:
"Whenever any individual refuses, on the basis of his privilege against self-incrimination, to comply with a civil investigative demand issued pursuant to subsection (f) of this section or to testify or produce other information in any proceeding under subsection (d) of this section, the Attorney General may invoke the provisions of the act of November 22, 1968 (No. 333), entitled 'An act authorizing courts of record to grant witnesses immunity from prosecution for or on account of any matter or thing concerning which they were ordered to testify in a proceeding before certain grand juries, investigating committees or commissions and courts of record; making the refusal to testify after such immunity criminal contempt and providing penalties,' by presenting a petition pursuant to section 2 of that act: Provided, however, That the phrase 'cause of action' in section 3 of that act shall not refer to civil proceedings brought pursuant to the provisions of subsection (d) of this section."
18 Pa.C.S.A. § 911(g) (1973) (footnotes omitted). Nowhere does subsection (g) say that the Immunity Act applies "only" to civil proceedings. A reasonable construction of subsection (g) is that it was intended to ensure that the Immunity Act extended to civil proceedings under the Corrupt Organizations Act, not that it was intended to limit the use of immunity in criminal proceedings. In enacting the Corrupt Organizations Act, the Legislature made it

that the Commonwealth allege a conspiracy to commit racketeering activity. As Judge Cercone stated in his dissenting opinion in the Superior Court:

"It therefore seems incongruous to suggest that the legislature sought to grant broader immunity powers to the Attorney General in civil proceedings where only a divestiture or injunction might be at stake; and where, because of the less severe sanction to be im-

clear that it perceived organized crime as a serious threat to the Commonwealth. Subsection (a) of the Act provides:

The General Assembly finds that:

(1) organized crime is a highly sophisticated, diversified, and widespread phenomenon which annually drains billions of dollars from the national economy by various patterns of unlawful conduct including the illegal use of force, fraud, and corruption;

(2) organized crime exists on a large scale within the Commonwealth of Pennsylvania, engaging in the same patterns of unlawful conduct which characterize its activities nationally;

(3) the vast amounts of money and power accumulated by organized crime are increasingly used to infiltrate and corrupt legitimate businesses operating within the Commonwealth, together with all of the techniques of violence, intimidation, and other forms of unlawful conduct through which such money and power are derived;

(4) in furtherance of such infiltration and corruption, organized crime utilizes and applies to its unlawful purposes laws of the Commonwealth of Pennsylvania conferring and relating to the privilege of engaging in various types of business and designed to insure that such businesses are conducted in furtherance of the public interest and the general economic welfare of the Commonwealth;

(5) such infiltration and corruption provide an outlet for illegally obtained capital, harm innocent investors, entrepreneurs, merchants and consumers, interfere with free competition, and thereby constitute a substantial danger to the economic and general welfare of the Commonwealth of Pennsylvania; and

(6) in order to successfully resist and eliminate this situation, it is necessary to provide new remedies and procedures.

18 Pa.C.S.A. § 911(a). Similar considerations also contributed to the enactment of the Immunity Act. Given these legislative purposes, this Court should not construe subsection (g) of the Corrupt Organizations Act as a limitation on the Attorney General's power to use the Immunity Act in the prosecution of organized crime and racketeering. Certainly it is inappropriate to do so in this case, which does not involve a criminal prosecution under the Corrupt Organizations Act. By its unfortunate dictum, the majority has erected yet another barrier to the prosecution of individuals involved in organized crime and racketeering.

posed upon the defendant, the 'immunized' witness would be more easily induced to commit perjury—or at least less motivated to tell the truth."

*Commonwealth v. Brady,* 228 Pa.Super. 233, 238, 323 A. 2d 866, 869 (1974) (dissenting opinion of Cercone, J., joined by Spaeth, J.). The Legislature did not intend such an incongruous result.

These considerations leave no doubt that the Legislature intended the Immunity Act to apply to those substantive crimes which are listed in Section 6. These crimes include the crimes by which organized crime and racketeering profit, and the methods by which they evade prosecution. The corrupting influence of these crimes presents a serious threat to society, irrespective of whether a conspiracy is alleged. These crimes may escape prosecution if law enforcement officials cannot resort to the use of immunity, even when a conspiracy is not involved. I see no reason to depart from the position taken by this Court in *In re Falone,* 464 Pa. 42, 346 A.2d 9 (1975), that the Immunity Act is not limited to proceedings relating to conspiracies.[25]

## III.

### Immunity Leaves the Privilege Against Self-Incrimination Inviolate

In support of its decision, the majority relies on the proposition that the Immunity Act must be narrowly construed to avoid infringement of fifth amendment rights. The simple answer to this proposition lies in the language of the fifth amendment: "no person  .  .  .

**25.** In *In re Falone,* this Court stated: "Section 6 defines 'organized crime or racketeering' to include 'bribery or extortion.' " 464 Pa. 42, 54, 346 A.2d 9, 16 (1975). In dissent, Mr. *Justice* Nix stated that the majority found "that conspiracy modified *only* the substantive crime of murder" and that the majority supported this finding by reasoning "that the legislature intended to grant immunity when the substantive crimes of bribery and narcotics offenses were committed." Id. at 64, 346 A.2d at 21.

shall be compelled in any criminal case to be a witness *against himself."* U.S.Const. amend. V (emphasis added). The fifth amendment does not grant the right to refuse to testify against others. When immunity is granted, so that the testimony cannot be used against the witness in any criminal proceeding, the witness is not being compelled to testify against himself. The idea that the fifth amendment gives a witness a privilege to refuse to testify, even when immunity has been granted, was rejected by the Supreme Court in *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), and by this court in *In re Falone,* 464 Pa. 42, 346 A.2d 9 (1975). The grant of immunity offered to the witnesses in this proceeding would fully protect their fifth amendment rights.

As this Court reasoned in *Falone:*

"[The] conclusion that the Act must receive a 'strict construction' is based on an erroneous view of immunity and the privilege against self-incrimination. It is incorrect that under the Act 'a person can be compelled to give testimony against himself' in the constitutional sense. When a witness receives a grant of immunity from prosecution that is at least as broad in scope and effect as the privilege against self-incrimination, his privilege is completely displaced because he has 'complete protection from all the perils against which the [privilege] was designed to guard.' [*Counselman v. Hitchcock,* 142 U.S. 547, 586, 12 S.Ct. 195, 206, 35 L.Ed. 1100 (1892); accord] *Zicarelli v. New Jersey State Commission of Investigation,* 406 U.S. 472, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972); *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); *Gardner v. Broderick,* 392 U.S. 273, 276, 88 S.Ct. 1913, 1915, 20 L.Ed.2d 1082 (1968) (dictum); *Murphy v. Waterfront Commission of New York Harbor,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964); *Ullmann v. United States,* 350 U.S. 422, 76 S.Ct. 497,

100 L.Ed. 511 (1956); *Hale v. Henkel,* 201 U.S. 43, 65–70, 26 S.Ct. 370, 375–77, 50 L.Ed. 652 (1906); *Brown v. Walker,* 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896); . . . *Riccobene Appeal,* 439 Pa. 404, 410, 268 A.2d 104, 108 (1970) (opinion announcing the judgment). A grant of immunity is sufficient to supplant the privilege if the witness is protected against use of the compelled testimony and all its fruits. *Kastigar v. United States,* supra. Immunity granted under the Act is 'transactional' immunity, *Riccobene Appeal,* supra, 439 Pa. at 412, 268 A.2d at 109, and thus is more extensive than necessary to displace the privilege.

As the Supreme Court stated in *Kastigar v. United States,* supra:

'[The] sole concern [of the privilege against self-incrimination] is to afford protection against being "forced to give testimony leading to the infliction of 'penalties affixed to . . . criminal acts.'" Immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom, affords this protection. It prohibits the prosecutorial authorities from using the compelled testimony in any respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness.'

406 U.S. at 453, 92 S.Ct. at 1661 (footnote omitted). Accordingly, a witness who is compelled to testify under the Act is not testifying 'against himself' in the constitutional sense, because his testimony cannot result in the infliction of criminal penalties. Thus, it is not necessary to accord the Act a 'strict construction' for the protection of the privilege against self-incrimination. We can perceive no reason why the Act should not 'be liberally construed to effect [its] objects and to promote justice.' Statutory Construction Act, 1 Pa.C.S. § 1928(c) (Supp.1974). Cf. *United*

*States v. Chavez,* 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed. 2d 380 (1974)."

Id. at 47–48, 346 A.2d at 12–13 (footnotes omitted).

The majority does not assert that the Immunity Act, as interpreted by the Commonwealth, would be unconstitutional. The federal immunity statute, 18 U.S.C.A. §§ 6001 et seq. (Supp.1976), which was upheld in *Kastigar v. United States,* supra, contains neither of the restrictions imposed by the majority today. Thus, there is no constitutional limitation restricting the use of the immunity power to proceedings before investigating grand juries, or to proceedings relating to criminal conspiracies.

If a statute must be given a narrow construction to avoid infringement of constitutional rights, the restrictions imposed should be directly related to the statute's asserted constitutional infirmity. See e. g., *Scales v. United States,* 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961). The restrictions imposed by the majority, however, bear no relation to the values protected by the privilege against self-incrimination.[26]

The majority refers to the "delicate balance created by the privilege," and concludes that these two witnesses cannot be required to testify because the proceeding is

26. If anything, the danger of the state intruding into the affairs of the individual is at its greatest in conspiracy prosecutions. As an inchoate crime requiring little or nothing in the way of an overt act, "conspiracy prescribes punishment for little more than state of mind." Filvaroff, Conspiracy and the First Amendment, 121 U.Pa.L.Rev. 189, 195 (1972).

Similarly, an investigating grand jury is much more likely to intrude into the affairs of the individual than an indicting grand jury because the scope of its inquiry is much less restricted. When testimony is presented before an indicting grand jury, it is for the purpose of determining whether there is a basis for indictment of a particular suspect against whom a criminal complaint has already been filed. When a witness is called before an investigating grand jury, on the other hand, he may be subjected to a much wider range of questioning, because the investigating grand jury is charged with uncovering possible criminal violations.

not before an investigating grand jury and does not relate to a criminal conspiracy. If the majority means to imply that the privilege against self-incrimination provides less protection when investigating grand juries are involved, or conspiracies are alleged, its analysis undermines fifth amendment values.

It is the provision for immunity, not the arbitrary restrictions imposed by the majority, which enables a grand jury to compel testimony without infringing on fifth amendment rights. The privilege against self-incrimination has been fully protected by the grant of immunity. Since a grant of immunity protects against infringement on the privilege against self-incrimination, there is no reason not to give the Immunity Act the broad interpretation intended by the Legislature.[27]

## IV.

### Immunity is Essential to the Prosecution of Organized Crime and Racketeering

Law enforcement must be directed not only at crime in the streets, but also at crime in the halls and chambers of government. To allow those who gain wealth and power through racketeering and corruption to escape prosecution erodes public confidence in government, and breeds disrespect for the law. The very power and influence which makes these crimes so inimical to the public welfare, however, makes it difficult to obtain testimony against these crimes. With this in mind the Legislature passed the Immunity Act; immunity is an essential tool for the prosecution of such crimes. Therefore, justice is

---

**27.** In sharp contrast with the majority's decision today is *People v. Superior Court (Kaufman)*, 12 Cal.3d 421, 115 Cal.Rptr. 812, 525 P.2d 716 (1974). In that case, the California Supreme Court held that a court has the power to grant immunity despite the absence of any specific legislative authorization. Recognizing that the grant of immunity leaves the privilege against self-incrimination inviolate, the court authorized a grant of immunity where it would further enforcement of the state's consumer protection laws.

not served by unnecessarily restricting the ability of prosecutors to use the Immunity Act in order to produce testimony before an investigating or an indicting grand jury.

The scope of power granted to grand juries is necessarily broad. As Mr. Justice Powell recently stated for the Supreme Court of the United States in *United States v. Calandra*, 414 U.S. 338, 343–44, 94 S.Ct. 613, 617–18, 38 L.Ed.2d 561 (1974):

> "The scope of the grand jury's powers reflects its special role in insuring fair and effective law enforcement. A grand jury proceeding is not an adversary hearing in which the guilt or innocence of the accused is adjudicated. Rather, it is an *ex parte* investigation to determine whether a crime has been committed and whether criminal proceedings should be instituted against any person. The grand jury's investigative power must be broad if its public responsibility is adequately to be discharged."

Accord, *Pirillo v. Takiff*, 462 Pa. 511, 523, 341 A.2d 896, 902 (1975), cert. denied, 423 U.S. 1083, 96 S.Ct. 873, 47 L.Ed.2d 94 (1976); see *United States v. Mandujano*, 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976) (plurality opinion); *United States v. Nixon*, 418 U.S. 683, 709, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039, 1064 (1974); *United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); *Appeal of Freedman*, 541 F.2d 373 (3rd Cir. 1976).

Thus, the principle that the public has "the right to every man's evidence" is particularly relevant to grand jury proceedings. *United States v. Mandujano*, supra; *United States v. Nixon*, supra; *United States v. Dionisio*, supra; *Branzburg v. Hayes*, supra; *In re Falone*, 464 Pa. 42, 346 A.2d 9 (1975). Of course a witness may be protected by the privilege against self-incrimination. In such a case, the Commonwealth must determine whether

the testimony is of sufficient import to its investigation to warrant a grant of immunity. The ability to grant immunity is an integral part of the grand jury's power and essential to its proper function. As stated by Mr. Chief Justice Burger in *Mandujano*:

> "[F]ederal statutes conferring immunity on witnesses in federal judicial proceedings, including grand jury investigations, are so familiar that they have become part of our 'constitutional fabric.' . . . Immunity is the Government's ultimate tool for securing testimony that otherwise would be protected . . . .
> [W]hen granted immunity, a witness once again owes the obligation imposed upon all citizens—the duty to give testimony—since immunity substitutes for the privilege."

425 U.S. at 575, 96 S.Ct. at 1776 (plurality opinion) (citations omitted).

The majority today prohibits the Commonwealth from using the Immunity Act to secure testimony before an indicting grand jury. Without such testimony, an indictment may not be obtained, and those engaged in organized crime and racketeering may escape prosecution. By its alternative holding, restricting the Immunity Act's application to conspiracies, the majority also impedes the efforts of investigating grand juries to uncover crimes involving bribery, extortion, and other forms of racketeering and corruption.

The majority asserts that the Immunity Act must be narrowly construed because ". . . a grant of immunity authorizes and even encourages interrogation which would otherwise be prohibited by the Fifth Amendment." As the majority recognizes, however, the privilege does not apply when there has been a grant of immunity, coextensive with that privilege. To reason that, because the grand jury's inquiry would be limited if the privilege applied, it must be limited when the privilege does not apply, is nonsense.

The grant of immunity "displaces the danger" of self-incrimination by fully protecting the witness. *Ullmann v. United States,* 350 U.S. 422, 439, 76 S.Ct. 497, 507, 100 L.Ed. 511, 525 (1956); accord. *United States v. Mandujano,* supra at 575, 96 S.Ct. at 1776; 48 L.Ed.2d at 222; *In re Falone,* supra at 47, 346 A.2d at 12. At the same time, it is an important ingredient to the successful functioning of grand juries and to the successful prosecution of organized crime and racketeering. Given the importance placed by the Legislature on investigating and prosecuting organized crime and racketeering, it could not have intended to limit arbitrarily and irrationally the power to use this essential tool.

Accordingly, I cannot accept the majority's arbitrary interpretation of the Immunity Act. Neither the Act nor the constitution limits the power to grant immunity to proceedings before investigating grand juries; there is no reason for this Court to do so. Likewise, I am satisfied that "organized crime or racketeering" is not limited to conspiracies to commit the substantive offenses listed in Section 6. As Judge Cercone stated in his dissenting opinion in the Superior Court:

> ". . . I am convinced that a construction of the immunity act which requires the allegation of a conspiracy to commit extortion is not warranted because of the clear intention of the legislature to employ broad new powers to eliminate the evil of organized crime and racketeering, especially when the racketeering is carried out in violation of a public trust. In the typical case, such racketeering is merely one link in a pernicious chain which shackles honest men both private and public. This link must be broken if the legislature and the courts hope to prevent further erosion of the trust that the governed must have in their government. The legislature has determined, and I of course agree, that this is a condition that can no longer be tolerated."

*Commonwealth v. Brady,* 228 Pa.Super. 233, 241, 323 A. 2d 866, 870–71 (1974) (dissenting opinion of Cercone, J., joined by Spaeth, J.) (footnotes omitted).

The grand jury proceeding in this case relates to alleged extortion and prohibited acts by public officials. Extortion and official corruption constitute a malignancy which threatens the public welfare and the public's confidence in government. Such crimes must be prosecuted, but it may be impossible to prosecute without resort to the immunity power.

Manifestly, this is the situation which the Legislature intended to reach when it adopted the Immunity Act. If the powers made available by the Immunity Act cannot be utilized, corrupt public officials can escape prosecution. The arbitrary limitations imposed by the majority are contrary to the language and the purpose of the Immunity Act.

I dissent.

O'BRIEN and POMEROY, JJ., join in this dissenting opinion.