500 A.2d 1117

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**David A. GOODMAN, Appellee.**

Superior Court of Pennsylvania.

Argued July 23, 1984.

Filed Sept. 27, 1985.

Reargument Denied Dec. 6, 1985.

404

Robert L. Eberhardt, Deputy District Attorney, Pittsburgh, for Commonwealth, appellant.

Rochelle S. Friedman, Pittsburgh, for appellee.

Before SPAETH, President Judge, and WICKERSHAM, BROSKY, WIEAND, CIRILLO, DEL SOLE, MONTEMURO, JOHNSON and POPOVICH, JJ.

MONTEMURO, Judge:

Herein, this court is asked to define the scope of the Attorney General's authority to investigate criminal offenses. In *Commonwealth v. Carsia*, 341 Pa.Super. 232, 491 A.2d 237 (1985), argued *eo die* as the present appeal, we held that the Attorney General's authority to prosecute criminal cases is limited to the specific instances set forth in Section 205(a)(1)–(8) of the Commonwealth Attorneys Act, Act of October 15, 1980, P.L. 950, No. 164, § 101 *et seq.*, 71 P.S. § 732–205(a)(1)–(8).[1]

---

1. **§ 732–205. Criminal prosecutions.**
    (a) Prosecutions.—The Attorney General shall have the power to prosecute in any county criminal court the following cases:
    (1) Criminal charges against State officials or employees affecting the performance of their public duties or the maintenance of the

That holding was based on the court's conclusion that the legislature intended the Commonwealth Attorneys Act to be the sole grant of authority to the Attorney General to prosecute criminal cases. In the present case, the Commonwealth, in the guise of the District Attorney of Allegheny

> public trust and criminal charges against persons attempting to influence such State officials or employees or benefit from such influence or attempt to influence.
>
> (2) Criminal charges involving corrupt organizations as provided for in 18 Pa.C.S. § 911 (relating to corrupt organizations).
>
> (3) Upon the request of a district attorney who lacks the resources to conduct an adequate investigation or the prosecution of the criminal case or matter or who represents that there is the potential for an actual or apparent conflict of interest on the part of the district attorney or his office.
>
> (4) The Attorney General may petition the court having jurisdiction over any criminal proceeding to permit the Attorney General to supersede the district attorney in order to prosecute a criminal action or to institute criminal proceedings. Upon the filing of the petition, the president judge shall request the Supreme Court to assign a judge to hear the matter. The judge assigned shall hear the matter within 30 days after appointment and make a determination as to whether to allow supersession within 60 days after the hearing. The district attorney shall be given notice of the hearing and may appear and oppose the granting of the petition. Supersession shall be ordered if the Attorney General establishes by a preponderance of the evidence that the district attorney has failed or refused to prosecute and such failure or refusal constitutes abuse of discretion.
>
> (5) When the president judge in the district having jurisdiction of any criminal proceeding has reason to believe that the case is a proper one for the intervention of the Commonwealth, he shall request the Attorney General to represent the Commonwealth in the proceeding and to investigate charges and prosecute the defendant. If the Attorney General agrees that the case is a proper one for intervention, he shall file a petition with the court and proceed as provided in paragraph (4). If the Attorney General determines that the case is not a proper case for intervention, he shall notify the president judge accordingly.
>
> (6) Criminal charges investigated by and referred to him by a Commonwealth agency arising out of enforcement provisions of the statute charging the agency with a duty to enforce its provision.
>
> (7) Indictments returned by an investigating grand jury obtained by the Attorney General.
>
> (8) Criminal charges arising out of activities of the State Medicaid Fraud Control Unit as authorized by Article XIV (relating to fraud and abuse control), act of June 13, 1967 (P.L. 31, No. 21), known as the "Public Welfare Code," and the Federal law known as the "Medicare-Medicaid Antifraud and Abuse Amendments." (Footnotes omitted)

County, argues that under section 206[2] of the Commonwealth Attorneys Act, the Attorney General has the authority to investigate any criminal offense which he reasonably believes he has the authority to prosecute under section 205 of the Act. We agree.

The context in which this appeal arises is by virtue of a Commonwealth appeal from an order of the Honorable John W. O'Brien, Court of Common Pleas of Allegheny County, granting the suppression motion of the appellee David Goodman.[3] In reviewing this order, we were bound by the standard set forth by the supreme court in *Commonwealth v. Hamlin*, 503 Pa. 210, 215, 469 A.2d 137, 139 (1983), namely:

[I]n reviewing a suppression court's ruling the appellate court is bound by factual findings supported by the record. *Commonwealth v. Wiggins*, 472 Pa. 95, 371 A.2d 207 (1977); and, they may not substitute their own findings for those of the suppression court. *Commonwealth v. Davis*, 491 Pa. 363, 421 A.2d 179 (1980). This principle of deference to trial courts has one important caveat however, appellate courts are not bound by findings whol-

2. § 732–206. **Law enforcement and criminal investigations; investigating grand juries.**

(a) Law enforcement; criminal investigations.—The Attorney General shall be the chief law enforcement officer of the Commonwealth; the district attorney shall be the chief law enforcement officer for the county in which he is elected. The Attorney General shall have the power to investigate any criminal offense which he has the power to prosecute under section 205; he shall continue the existing programs relating to drug law enforcement. The Pennsylvania State Police shall cooperate with the Attorney General and furnish such services as the Attorney General shall request.

(b) Investigating grand juries.—The Attorney General shall convene and conduct investigating grand juries as provided in the act of November 22, 1978 (P.L. 1148, No. 271), known as the "Investigating Grand Jury Act." (Footnotes omitted).

3. Our review of the record in this case indicates that the suppression order effectively terminated the prosecution. We conclude therefore that the appeal is from a final order and that this court's jurisdiction has been invoked properly. *Commonwealth v. Dugger*, 506 Pa. 537, 486 A.2d 382 (1985); *Commonwealth v. Chandler*, 505 Pa. 113, 477 A.2d 851 (1984); *Commonwealth v. Hamlin*, 503 Pa. 210, 469 A.2d 137 (1983).

ly lacking in evidence. *Commonwealth v. Hall*, 475 Pa. 482, 380 A.2d 1238 (1977).

*See also, Commonwealth v. Chandler*, 505 Pa. 113, 117, 477 A.2d 851, 853 (1984). The following facts were testified to at the suppression hearing.

On April 14, 1982, Charles Park, a security representative of the Bell Telephone Company, during examination of computer records, noticed that signal irregularities were emanating from a telephone service registered to the appellee. The irregularities were indicative of the use of a "blue box." A "blue box" is an electronic "tone generating" device which is used to circumvent the telephone company's billing apparatus and thereby obtain free telephone service. Park informed his supervisors of the possible use of the device. He then connected to the appellee's service a Dialed Number Recorder (DNR)[4] and a tape recorder. The DNR and tape recorder remained connected for a period of approximately twenty-six hours (from 2:00 P.M., April 15, 1982 to 4:15 P.M., April 16, 1982). During this period, eight conversations were intercepted and recorded.

On April 16 or 17, 1982, Robert Meinert, the head of the Bell Telephone security in Pittsburgh, contacted Special Agent Dennis Danask of the Bureau of Criminal Investigation (BCI), the investigative arm of the office of the Attorney General. Meinert informed Danask of the details of the investigation which Bell Telephone had conducted thus far.

Agent Danask relayed this information to Deputy Attorney General Lawrence Claus, who was in charge of criminal investigations in Western Pennsylvania. Claus told Danask that "without further information, we really couldn't make a decision as to whether or not it would be an area in which

---

**4.** A DNR is a device which records numbers dialed by the subject telephone on a paper tape by monitoring the electrical impulse caused by dialing; it records on the tape the time the numbers are dialed; it monitors the length of time the targeted telephone is off the hook on outgoing calls; and it monitors the date and length of time the targeted telephone is off the hook on incoming calls. *Commonwealth v. Beauford*, 327 Pa.Super. 253, 259, 475 A.2d 783, 786 (1984). In the instant case, the DNR and the tape recorder were activated only when the "blue box" was utilized.

the Attorney General's Office had jurisdiction." (N.T. April 27, 1983 at 23).

On April 21, 1982, Agent Danask and Deputy Attorney General Claus met with Park and Meinert of Bell Telephone to discuss the incident. They were informed that on two of the calls, the appellee had identified himself as "Attorney Goodman." Claus later testified that he felt that this fact gave rise to the possibility of investigation and prosecution by the Attorney General under the authority granted by Section 205(a)(2) of the Commonwealth Attorneys Act, which authorizes the Attorney General to prosecute cases involving corrupt organizations under 18 Pa.C.S. § 911. We note further that at this time there was an informal discussion between Claus and Allegheny County Assistant District Attorney wherein it was agreed that the case should proceed through the Attorney General's Office.

On April 26, 1982, based on the information received from Bell Telephone, Agent Danask applied for and executed a warrant to search the appellee's office/residence. The warrant application set forth the information received from Park and Meinert and alleged violations of 18 Pa.C.S. § 910, prohibiting the manufacture, distribution or possession of devices for theft of telecommunications services, and 18 Pa.C.S. § 3926, theft of services. The application further stated that the objective of the search was to locate and seize "blue boxes" or components, paraphernalia or manuals concomitant thereto.

The search was executed by BCI agents. A device which was identified as a "blue box" was discovered and seized. In the course of searching for another device, the agents found a sawed-off shot gun, and they were told by appellee that several automatic weapons were on the premises. While two BCI agents secured the premises, a second warrant was obtained for the seizure of the shotgun. Subsequently, a third warrant was obtained for the seizure of several automatic weapons.

On May 12, 1982, Agent Danask filed a criminal complaint against appellee charging him with possession of a

device for the theft of telecommunications services,[5] theft of services,[6] and multiple counts of prohibited offensive weapons.[7] After the complaint was filed, but prior to the preliminary hearing, the Office of the Attorney General, upon review of the evidence, determined that a basis for the Attorney General's prosecution of the case did not exist. The case was turned over to the Allegheny County District Attorney's office which assumed the prosecution.

Several pretrial motions were filed seeking the dismissal of the informations and suppression of the evidence. These motions were denied. However, on April 8, 1983, the appellee filed a motion to suppress evidence, which the lower court treated as an amendment to the appellee's omnibus pretrial motion. After hearings and arguments, on April 28, 1983, the lower court granted the motion to suppress on the ground that the Attorney General's Office lacked "jurisdiction" to investigate the incident and that suppression was appropriate. A Commonwealth motion for reconsideration was denied and a timely appeal was taken to this court.

The Commonwealth raises two issues:

I. The suppression court erred in concluding that the execution of the search warrant by agents of the Attorney General was in contravention of the Attorney General's authority to investigate.

II. The court below erred in ruling that suppression was the necessary remedy for an alleged violation of the Commonwealth Attorneys Act.

We shall discuss them *ad seriatim.*

## I. THE ATTORNEY GENERAL'S AUTHORITY TO INVESTIGATE.

The scope of the Attorney General's authority to investigate a criminal offense is set forth in section 206 of the Commonwealth Attorneys Act. *See* n. 2 *supra.* The clause relevant to our immediate discussion is that which reads:

5. 18 Pa.C.S. § 910.

6. *Id.,* § 3926.

7. *Id.,* § 908.

"The Attorney General shall have the power to investigate any criminal offense which he has the power to prosecute under section 205." The Commonwealth asserts that, at the time of the investigation and based upon the information available, the Attorney General's Office had a reasonable belief the investigation and prosecution of the appellee was within its authority under sections 206(a) and 205(a)(2) (relating to corrupt organizations) and 205(a)(7) (relating to investigative grand juries) of the Commonwealth Attorneys Act. It asserts that the power to investigate criminal offenses must necessarily be broader than the power to prosecute those offenses because

> [t]he decision to initiate a prosecution under § 732–205 will arise where the [A]ttorney [G]eneral is made aware of facts that justify his commencement of a prosecution. Normally, information first brought to the [A]ttorney [G]eneral's attention will be an insufficient basis upon which to render a decision to prosecute. Instead, initial facts will require further investigation to determine whether an activity arises to a crime that warrants prosecution by the [A]ttorney [G]eneral under 205.

Appellant's brief at 15–16.

Initially, we note that this argument is not applicable logically to those sections of the Commonwealth Attorneys Act wherein the Attorney General's authority is invoked by request. *See* 71 P.S. § 732–205(a)(3) (request of district attorney); 71 P.S. § 732–205(a)(5) (request of president judge); 71 P.S. § 732–205(a)(6) (referral by Commonwealth agency). Rather, it is an assertion that the Attorney General must have some factual basis upon which to determine whether to invoke his authority to prosecute corruption of state officials under 71 P.S. § 732–205(a)(1), corrupt organizations under 71 P.S. § 732–205(a)(2), or medicaid fraud under 71 P.S. § 732–205(a)(8); or upon which to determine when he must petition to supersede a county district attorney under 71 P.S. § 732–205(a)(4), or convene an investigative grand jury under 71 P.S. § 732–205(a)(7) and 71 P.S. § 732–206(b). The argument is essentially that the Attor-

ney General must have the authority to investigate allegations of criminal conduct which, if proven, would give rise to criminal charges which can be prosecuted by the Attorney General.

The appellee, on the other hand, argues that:

[T]he clear intent of the Act is to allow the Attorney General to investigate and subsequently prosecute only certain crimes. All other crimes are left to the numerous and qualified local law enforcement agencies. It is absurd to adopt the Commonwealth's rationale. Under that theory the Attorney General's Office could investigate every possible crime, and once they would determine it does not fall under their jurisdiction, then turn it over to local authorities. It is much more logical to assume that local authorities are to investigate crimes. Once the investigation showed that the Attorney General would have jurisdiction, the case is then turned over to the Attorney General's Office. Not only is this the clear intent of the Act, but it also alleviates the legal evidentiary problems created by the seizure of evidence by authorities without jurisdiction. Clearly, allowing the local authorities to gather and seize the evidence eliminates the risk of suppression of the evidence due to lack of jurisdiction.

Appellee's brief at 8.

The resolution of this issue depends upon the legislature's intendment as to the investigative powers of the Attorney General 1 Pa.C.S. §§ 1901, 1921. Section 206 replaced that part of the section of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, art. IX, § 904, *et seq.*, 71 P.S. § 294, which gave the Attorney General the power, and the duty to "investigate any violations, or alleged violations, of the laws of the Commonwealth which may come to its notice." The present section is much more limited in scope, and obviously evidences a legislative intent to decrease the extent of the Attorney General's investigative authority.

On the other hand, we refuse to accept a construction of section 206 which would denude the Attorney General of his investigative powers. It would be ludicrous to conclude that the Attorney General's investigative powers, namely, the power and authority to uncover evidence of criminal conduct which could lead to criminal prosecution, is limited to only those situations wherein it is certain that the investigation will lead to prosecutions authorized by section 205 of the Commonwealth Attorneys Act. If this were the legislature's intent, the result would be a virtual paralysis of the Attorney General's investigative powers. Because such a result would be both absurd and unreasonable, we find it unacceptable. We do not believe the legislature intended such a result. 1 Pa.C.S. § 1922(1).

However, we must also heed the legislature's mandate that the Attorney General's investigative authority extends only to "any criminal offense which he has the power to prosecute." This provision must be given some meaningful effect.

This court must now decide a question of law upon which there is no authority to provide guidance. The previous statute, and the case law interpreting that statute, was much different and cannot be relied on as an accurate barometer of the legislature's intent.[8] The legislative history of section 206, as set forth in JOINT STATE GOVERNMENT COMMISSION: TASK FORCE ON THE OFFICE OF ELECTED ATTORNEY GENERAL Final Report (September 1, 1978) (hereinafter "TASK FORCE"), does not

8. We note here a principal difference between this case and *Commonwealth v. Carsia,* 341 Pa.Super. 232, 491 A.2d 237 (1985). In *Carsia,* the issue concerned the scope of the Attorney General's authority to prosecute criminal actions vis-a-vis that same authority which was vested in the various district attorneys. In resolving that issue, extensive reference to the prior statute and interpretive case law was made. In *Carsia,* this analysis was used to emphasize the historical conflict present between the Attorney General and the district attorneys, and so to demonstrate its effect on legislative intent. We conclude, however, that this historical analysis is not relevant herein because that conflict has been over prosecutorial authority, not investigative authority.

address this particular question.[9]  Consequently, this court must attempt to establish a correct statement of law.

█  We believe that the legislature, when it promulgated section 206 of the Commonwealth Attorneys Act, intended that the Office of Attorney General be empowered to investigate any criminal offense which it *reasonably believes*, at the time of the investigation and with the information it then possesses, it is able to prosecute under section 205. However, we also believe that, if challenged, the Attorney General should be able to produce evidence which would establish by a preponderance of the evidence that a factual basis existed which supported that belief.  In our opinion, this standard strikes a balance between the need of the Attorney General to possess the power to properly execute its statutory function and the apparent intent of the legislature to diminish the investigative authority of the Attorney General from that which was previously wide-ranging and comprehensive.

In light of the foregoing analysis, we now must address the question:  Did the Attorney General's Office, based upon the information it possessed prior to its application for the search warrant, have a reasonable belief that it could prosecute David Goodman under section 205 of the Commonwealth Attorneys Act?  We believe it did not.

█  We reject at the outset the Commonwealth's contention that the Attorney General's Office reasonably believed

9.  The relevant provision is set forth in the general concepts upon which the task force based its proposed legislation, to wit:

The elected Attorney General must serve as the independent chief *law-enforcement* officer to investigate and, where appropriate, prosecute criminal charges of wrongdoing by State officials and employees and by persons engaged in widespread organized corruption. The delicate balance between providing a vigorous statewide chief law-enforcement officer while not impinging upon the jurisdiction and duties of the constitutionally created office of county-elected district attorney led to careful consideration of the scope and implementation of the criminal jurisdiction of the elected Attorney General.

JOINT STATE GOVERNMENT COMMISSION: TASK FORCE ON THE OFFICE OF THE ELECTED ATTORNEY GENERAL Final Report (September 1, 1978), p. 5 (original emphasis).

it could prosecute by virtue of section 205(a)(7) and 206(b), i.e., the facts known at the time of the investigation raised at least the possibility of the need for a multi-county investigative grand jury. As the testimony of Assistant Attorney General Lawrence Claus at the suppression hearing clearly indicates, after his April 21, 1982 meeting with Bell Telephone officials, no factual basis existed for the assumption that the "blue boxes" were manufactured within the state and were involved in inter-county commerce. It is also clear the search warrant was applied for and executed solely upon the belief that the Attorney General could prosecute under the corrupt organizations statute.[10] Thus, the only justification for the Attorney General's investigation rests on the grant of authority under section 205(a)(2), which in turn relies on his authority under 18 Pa.C.S. § 911.[11]

**10.** The notes of Testimony for April 28, 1983 reveal the following: [By Claudia Sharon, trial counsel]

Q. My question was at this meeting, what information did you receive, facts or information, that told you that this particular blue box was being manufactured in Pennsylvania?

[Mr. L. Claus]

A. There were no facts, that's why I indicated to you previously that the idea of conducting a multi-county investigating grand jury case on this did not come to fruition.

Q. Well, on April 21, you did not get any facts to indicate this to you that this was being manufactured in Pennsylvania, is that right, someone said maybe it is?

A. That's correct, there was no basis to it.

Q. No basis whatsoever, however, you still assumed jurisdiction; is that right?

A. On the basis of 911 [18 Pa.C.S. § 911], yes, multiple offenses.

Q. And you still continued to investigate; is that right?

A. That's correct.

Q. You obtained search warrants and executed them and received evidence?

A. That's correct.

N.T. April 28, 1983 at 43–44.

**11.** There is no question as to the Attorney General's authority to prosecute offenses defined in 18 Pa.C.S. § 911, as subsection 911(e) states:

Enforcement.—

(1) The Attorney General shall have the power and duty to enforce the provisions of this section, including the authority to issue civil investigative demands pursuant to subsection (f), institute

The purpose behind the corrupt organizations statute is set forth in its initial subsection (a), which provides:

**Findings of fact.**—The General Assembly finds that:

(1) organized crime is a highly sophisticated, diversified, and widespread phenomenon which annually drains billions of dollars from the national economy by various patterns of unlawful conduct including the illegal use of force, fraud, and corruption;

(2) organized crime exists on a large scale within the Commonwealth of Pennsylvania, engaging in the same patterns of unlawful conduct which characterize its activities nationally;

(3) the vast amounts of money and power accumulated by organized crime are increasingly used to infiltrate and corrupt legitimate businesses operating within the Commonwealth, together with all of the techniques of violence, intimidation, and other forms of unlawful conduct through which such money and power are derived;

(4) in furtherance of such infiltration and corruption, organized crime utilizes and applies to its unlawful purposes laws of the Commonwealth of Pennsylvania conferring and relating to the privilege of engaging in various types of business and designed to insure that such businesses are conducted in furtherance of the public interest and the general economic welfare of the Commonwealth;

(5) Such infiltration and corruption provide an outlet for illegally obtained capital, harm innocent investors, entrepreneurs, merchants and consumers, interfere with free competition, and thereby constitute a substantial

proceedings under subsection (d), and to take such actions as may be necessary to ascertain and investigate alleged violations of this section.

(2) The Attorney General and the district attorneys of the several counties shall have concurrent authority to institute criminal proceedings under the provisions of this section.

(3) Nothing contained in this subsection shall be construed to limit the regulatory or investigative authority of any department or agency of the Commonwealth whose functions might relate to persons, enterprises, or matters falling within the scope of this section.

danger to the economic and general welfare of the Commonwealth of Pennsylvania; and

(6) in order to successfully resist and eliminate this situation, it is necessary to provide new remedies and procedures.

Under the Act, it is "unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity in which such person participated as a principal, to use or invest, directly or indirectly, any part of such income, in the acquisition of any interest in ... or operation of, any enterprise." 18 Pa.C.S. § 911(b)(1). Racketeering activity includes crimes found in Chapter 39 of the Crimes Code and covers, among other offenses, the theft of telephone service. *Id.* §§ 911(h)(1)(i), 3926(a)(2). Finally, enterprise includes "any individual ... engaged in commerce," *id.* § 911(h)(3), while a pattern of racketeering activity "refers to a course of conduct requiring two or more acts of racketeering activity." *Id.* § 911(h)(4).

The Commonwealth's argument is that, prior to obtaining the first search warrant on April 26, 1982, the Attorney General's Office had information which gave it reason to believe the appellee was an attorney, engaged in commerce, who had committed at least two acts of racketeering, i.e., two acts constituting the theft of telephone service. As Assistant Attorney General Claus testified:

Well, the significance, to me, involved Section 911 of the Commonwealth Attorneys Act [sic], and one of the areas in which the [A]ttorney [G]eneral's office, by specific statute, is given the authority to investigate and prosecute, or in situations where there is a pattern of racketeering activity, specifically in regard to conducting or maintaining or operating an enterprise, and the statute defines an enterprise under 911, Section H(3) as any situation or any individual engaged in commerce. And as far as I could see, on the basis of the telephone calls by Mr. Goodman identifying himself as an attorney, he was engaged in the practice of business and, therefore, fell within the scope of the corrupt organization section. The

fact that there were more than two [telephone calls] indicated that it fits into the definition section of a pattern of activity, racketeering activity that 911 gives jurisdiction for the [A]ttorney [G]eneral's office to become involved with.

N.T. April 28, 1983 at 31.

■ This argument misconstrues the corrupt organization statute and, in fact, contradicts the Attorney General's eventual decision to discontinue its own prosecution of Goodman.[12] Basically, the Commonwealth's contention, at the suppression hearing and now on appeal, is that prior to applying for and executing the search warrant, the Attorney General intended to prosecute Goodman under section 911. However, nothing in the record substantiates this assertion. Indeed, the initial search warrant and accompanying affidavit listed the crimes to be investigated as violations of sections 910 (relating to manufacture, distribution of devices for theft of telecommunication services) and 3926 (relating to theft of services); no mention was made to any corrupt organizations offense. Thus, even though the Attorney General "intended" to prosecute Goodman for a first degree felony under section 911,[13] he did not think it important to include such an offense in the application for the search warrant. Rather, the only offenses listed by the Attorney General were a misdemeanor of the first degree and, at most, a felony of the third degree. 18 Pa.C.S. §§ 910(b), 3926(c), 3903(a). The Commonwealth offers no explanation for its decision not to include section 911 violations in the application for the search warrant despite its "intention" to prosecute under that statute.[14]

12. We note that the appellee was never charged with any violation of 18 Pa.C.S. § 911.

13. 18 Pa.C.S. § 911(c) makes a violation of that statute a first degree felony.

14. We do not intend to intimate that the Commonwealth was obliged in any way to state in the application for the search warrant the specific statutes it believed were being violated by Goodman. *Cf. Commonwealth v. Taraschi*, 327 Pa.Super. 179, 475 A.2d 744 (1984). Our discussion here is solely to point out that when the Attorney General decided to go beyond the required contents of a search

It is also interesting to note that the Attorney General's intention to prosecute Goodman was formed *before* the search warrant was executed. However, *after* the warrant was executed, and evidence was discovered and seized, the Attorney General decided *not* to prosecute. Thus, the decision not to prosecute was reached when the Attorney General had the same, if not more, information regarding the applicability of section 911 to Goodman's activities.

If anything, the circumstances of this case appear to evidence an "intention" to prosecute Goodman for a corrupt organizations offense after it investigated him, not before he was investigated. The Commonwealth's justification for investigating Goodman is simply not supported by the record before us. In short, it appears the Attorney General's "intention" was formed in hindsight, not with foresight.

Even if we were to accept the Commonwealth's argument that the Attorney General planned all along to prosecute under section 911, we do not find the investigation to have been reasonable. As the initial subsection of the statute repeatedly and explicitly states, section 911 address itself to the problem of *organized crime.* It is a well established rule of statutory construction that the preamble of a statute may be considered in the statute's construction. 1 Pa.C.S. § 1924. It is not surprising, then, that our supreme court has interpreted section 911 as having the "primary purpose . . ., through the use of civil remedies of the type traditionally employed against antitrust violators, to prevent the infiltration of legitimate business enterprises *by organized crime." Commonwealth v. Brady,* 470 Pa. 420, 433, 368 A.2d 699, 706 (1977) (emphasis added) (footnote omitted).[15] In addition, the Task Force Report on the Commonwealth Attorneys Act described section 205(a)(2) of that act as empowering the Attorney General to prosecute "[c]riminal cases which relate to *organized crime"* because "the grow-

warrant as listed in Pa.R.Crim.P. 2005, the only violations he *did include* were ones much less serious in nature than the violation with which it was intended to charge Goodman.

**15.** Civil remedies for violations of section 911 are set forth at 18 Pa.C.S. § 911(d).

ing complexity of *organized crime* often necessitates substantial resources, sophisticated training and central coordination not possessed by many of the district attorney's office." TASK FORCE, *supra*, at 13–14. (emphasis added).

█ The foregoing makes it clear that the Pennsylvania Corrupt Organizations Act was intended to grant the Attorney General the authority to prosecute individuals, among other "entities", engaged in systematic and pervasive criminal activities, which types of activities are set forth in section 911(h). In our judgment, a reasonable reading of section 911 would not result in the conclusion that the use of a "blue box" (to avoid telephone company charges) by an individual attorney in the course of his legal practice constitutes the crime contemplated by section 911. To read this statute differently, under the facts of this case, would bring about unreasonable, if not absurd, results which we cannot sanction. 1 Pa.C.S. § 1922.

In reaching this interpretation of section 911, we have found some enlightenment from federal decisions interpreting the Racketeer Influenced and Corrupt Organization Provisions, Title IX of the Organized Crime Control Act of 1970, Pub.L. 91–452, 84 Stat. 941, codified at 18 U.S.C. §§ 1961 *et seq.* (hereinafter RICO). Although these cases are not controlling and the Pennsylvania and federal acts are not identical, "both are directed at curbing illegal racketeering activities." *Commonwealth v. Taraschi.* 327 Pa. Super. 179, 187–88 n. 2, 475 A.2d 744, 748 n. 2 (1984). In addition, section 911 was based upon the RICO statute, even to the extent of incorporating much of the federal act's language. *Commonwealth v. Brady, supra,* 470 Pa. at 433 n. 17, 368 A.2d at 706 n. 17; *see also,* TOLL, PENNSYLVANIA CRIMES CODE ANNOTATED § 911 (1974); Comment, *The Pennsylvania Attack on Racketeers in Legitimate Enterprises,* 78 DICK.L.REV. 176, 176–78 (1973).

As our supreme court had done with section 911 in *Brady,* the United States Supreme Court has interpreted

RICO as primarily an attack on organized crime's infiltration of legitimate business. *United States v. Turkette,* 452 U.S. 576, 591, 101 S.Ct. 2524, 2532, 69 L.Ed.2d 246 (1981). That being the unmistakable purpose of RICO, the act has also been interpreted as *not* intended "to subject ordinary criminals to the [a]ct's heightened punishment." *United States v. Lemm,* 680 F.2d 1193, 1198 (8th Cir.1982).[16]

We are fully cognizant of the fact that some of the federal courts which have addressed this specific issue have held there is no requirement under RICO for the prosecution to prove a nexus between the individual being prosecuted and "organized crime." *See, e.g., United States v. Aleman,* 609 F.2d 298 (7th Cir.1979); *United States v. Chovanec,* 467 F.Supp. 41 (S.D.N.Y.1979); *United States v. Vignola,* 464 F.Supp. 1091 (E.D.Pa.1979); *United States v. Mandel,* 415 F.Supp. 997 (D.Md.1976); *cf. Saine v. A.I.A., Inc.,* 582 F.Supp. 1299 (D.Colo.1984) (civil liability); *D'Iorio v. Adonizio,* 554 F.Supp. 222 (M.D.Pa.1982) (same). These blanket statements, however, are better understood in light of the Eight Circuit's reasoning in *United States v. Bledsoe,* 674 F.2d 647 (8th Cir.1982). Therein the court stated:

> Obviously, no statute could and this statute was not intended to require direct proof that individuals are 'organized crime.' *United States v. Campanale,* 518 F.2d 352, 363–64 (9th Cir.1975), *cert. denied,* 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976); *United States v. Chovanec,* 467 F.Supp. 41, 44–45 (S.D.N.Y.1979) .... [However], [e]ach element of the crime, that is, the predicate acts, the pattern of such acts, and the enterprise requirement, was designed to limit the applicability of the statute and separate individuals engaged in organized crime from ordinary criminals.

**16.** Under the circumstances of this case, a violation of § 911 could result in harsher punishment than if the appellee was convicted and sentenced under 18 Pa.C.S. § 3926, the theft of services statutes. A violation of § 911 is a first degree felony while § 3926 violations will not exceed a felony of the third degree. *Compare* 18 Pa.C.S. § 911(c) *with* 18 Pa.C.S. § 3926(c).

*Id.* at 663; *United States v. Lemm, supra.; cf. United States v. Anderson,* 626 F.2d 1358, 1367–68 (8th Cir.1980) ("we find nothing in the language, structure, or history of the Act to imply that ... Congress was attempting to enhance the punishment of offenders merely because they commit more than one of the predicate crimes").

■ We believe the reasoning of the Eighth Circuit is persuasive, for it addresses itself to the very real "danger of abuse where a prosecutor attempts to apply the statute to situations for which it was not primarily intended." *United States v. Huber,* 603 F.2d 387, 395–96 (2d Cir.1979); *cf. Commonwealth v. Brady, supra.* If the Attorney General had proceeded to prosecute in the instant case, we believe such an abuse would have occurred here. As stated above, no reasonable interpretation of section 911 would allow the Attorney General to exercise authority to prosecute crimes outside those contemplated by the primary purpose of the statute. Under the facts of this case, it was not reasonable for the Attorney General to believe he could prosecute Goodman under section 911; likewise, under section 206 of the Commonwealth Attorneys Act, he could not investigate Goodman.

■ Finally, we add that we do not believe the Attorney General's "contacts" with the Allegheny County District Attorney's Office satisfied the requirements of the Commonwealth Attorneys Act regarding the substitution of the Attorney General in a criminal prosecution pursuant to 71 P.S. § 732–205(a)(3). Indeed, the Commonwealth concedes the Attorney General never proceeded under section 205(a)(3). Appellant's Brief at 19. As the notes of testimony of the suppression hearing indicate, all communications between the Attorney General's Office and the Allegheny County District Attorney's Office were initiated by the Attorney General's Office after its preliminary investigation had already begun. *See* N.T. April 28, 1982, at 24, 27. Hence, no "request", formal or otherwise, was ever made by the district attorney as specifically provided for in 71 P.S. § 732–205(a)(3). More importantly, the record also

reveals that at no time was there any representation by either law enforcement office that the district attorney "lack[ed] the resources to conduct an adequate investigation," or that there was a "potential for an actual or apparent conflict of interest on the part of the district attorney or his office." *Id.* We, therefore, reject the Commonwealth's argument that there was any substitution under section 205, by agreement or request, which permitted the Attorney General to investigate.[17]

## II. SUPPRESSION.

In the present case, the challenge was made by means of a motion to suppress.[18] The lower court, in its opinion of November 3, 1983, first determined that the Attorney General lacked the "jurisdiction" to investigate the case; then, by analogizing the circumstances to those cases wherein municipal law enforcement agents make arrests or execute search warrants outside their territorial jurisdiction, the court ruled that suppression was the appropriate remedy, citing *Commonwealth v. Fiume*, 292 Pa.Super. 54, 436 A.2d 1001 (1981) and *Commonwealth v. Anzalone*, 269 Pa.Super. 549, 410 A.2d 838 (1979). *Fiume* and *Anzalone* dealt with the legislative grant of authority which permitted municipal police officers to arrest suspected criminal offenders outside the territorial limits of the political subdivision employing such officers. That grant of authority is found in its present form at 42 Pa.C.S. § 8951 *et seq.* Because this court had concluded that suppression was the appropriate remedy for the statutory violation in *Fiume* and *Anzalone*,[19] the lower court in the instant case felt compelled[20] to

---

17. It is undisputed that the Attorney General made no attempt to supersede the district attorney pursuant to 71 Pa.C.S. § 732–205(a)(4).

18. In fact, a challenge originally was made to the Attorney General's participation in the case in a motion to dismiss information as part of the omnibus pretrial motion. This motion was denied by the lower court.

19. *See also, Commonwealth v. Mason*, 327 Pa.Super. 520, 476 A.2d 389 (1984), *rev'd,* 507 Pa. 396, 490 A.2d 421, (1985); *Commonwealth v. Bable*, 254 Pa.Super. 72, 385 A.2d 530 (1978). Although this court has held that suppression is the remedy, other jurisdictions have refused

suppress the evidence seized by the Commonwealth as a result of the Attorney General's violation of the Commonwealth Attorneys Act.

The analogy is indeed an apt one. However, a recent opinion by our supreme court has cast serious doubt on the propriety of applying the drastic remedy of exclusion in cases involving extraterritorial executions of search warrants. *Commonwealth v. Mason,* 507 Pa. 396, 490 A.2d 421, 427 (1985); *see generally, Commonwealth v. Corley,* 507 Pa. 540, 491 A.2d 829 (1985) (Larsen, J., concurring). Considering that our opinion in *Mason* was guided by the earlier extraterritorial arrest cases, *Commonwealth v. Mason,* 327 Pa.Super. 520, 547, 476 A.2d 389, 402 (1984), the use of suppression by the lower court here is all the more suspect.

*Mason* involved, *inter alia,* the question of "whether a search warrant may legally be *executed* by non-jurisdictional police or, stated another way, must the officer *executing* the warrant have the authority to act as an officer where the warrant is *executed.*" *Id.,* 327 Pa.Superior Ct. at 544, 476 A.2d at 401 (original emphasis). This court determined that if the executing law enforcement officer did not have the authority by virtue of a legislative grant,[21] then the search pursuant to the search warrant would be illegal

to exclude evidence obtained as a result of violations of similar statutes. *See e.g., People v. Wolf,* 635 P.2d 213 (Colo.1981); *City of Kettering v. Hollen,* 64 Ohio St.2d 232, 416 N.E.2d 598 (1980). The Pennsylvania Supreme Court has not squarely addressed the issue of applying the exclusionary rule in this line of cases. *Cf. Commonwealth v. Davis,* 466 Pa. 102, 108 n. 4, 351 A.2d 642, 645 n. 4 (1976) ("We ... do not determine the remedy to be applied if arresting officers act outside their jurisdiction."); *but see* discussion of *Mason, infra.*

20. The suppression court judge, the Honorable John W. O'Brien of the Court of Common Pleas of Allegheny County, reluctantly applied the exclusionary rule in this case. As Judge O'Brien noted, he had been the suppression judge in *Commonwealth v. Fiume,* 292 Pa.Super. 54, 436 A.2d 1001 (1981), and had been reversed on appeal by this court for *failing* to suppress the evidence. See lower court opinion at 16–18.

21. The legislative grant of authority in *Mason* was the predecessor to 42 Pa.C.S. § 8953. *See Commonwealth v. Mason,* 327 Pa.Super. at 544 n. 15, 476 A.2d at 401 n. 15.

unless the officer was accompanied by jurisdictional police who participated in the search. We also concluded that the mere presence of jurisdictional police at the location of the search was not sufficient to constitute the participation necessary for a legal search. On appeal, the supreme court reversed, holding that the mere presence of jurisdictional police was sufficient to make the search a legal one. *Commonwealth v. Mason*, 507 Pa. 396, 408, 490 A.2d 421, 427 (1985). Because there was no illegality, suppression was not available.

Despite its holding, the supreme court, in rather extensive dicta, proceeded to discuss the general applicability of the exclusionary rule. Turning its attention to the Pennsylvania Rules of Criminal Procedure, the court rejected the notion that any and every violation of the rules regarding the execution of search warrants required exclusion. The court also rejected the proposition that Pa.R.Crim.P. 2004, relating to individuals authorized to serve a search warrant, assumes that the law enforcement officer serving a search warrant is one authorized to do so under the relevant statute providing for statewide municipal police jurisdiction.[22] Thus, the supreme court implied that a non-jurisdictional police officer could properly execute a search warrant pursuant to Rule 2004, even if it resulted in a violation of the officer's statutory grant of authority. Exclusion would not be applicable despite the statutory violation, as the search comported with the requirements of the Rules. In other words, the supreme court appears to be of the opinion that a violation of the state-wide municipal jurisdiction statute standing alone would not necessitate suppression of evidence. This reading of *Mason* also suggests the impropriety of applying an exclusionary rule in the instant case, since here, suppression was applied solely because the Commonwealth Attorneys Act was violated.

**22.** We do note, however, that the supreme court has instructed its Rule Committee to draft amendments to the Rules in conformity with 42 Pa.C.S. § 8953. *Commonwealth v. Mason*, 507 Pa. at 408 n. 3, 490 A.2d at 427 n. 3.

In addressing the application of such a rule, we first consider the type of violation which occurred here. Appellee Goodman contends that the violation of the Commonwealth Attorneys Act by the Attorney General's Office is of constitutional dimensions under both the United States [23] and Pennsylvania [24] Constitutions, which prohibit unreasonable searches and seizures. We cannot agree.

■ As the Commonwealth correctly points out, the Commonwealth Attorneys Act does not provide a remedy to any defendant in a criminal prosecution for a violation of the Act. In addition, the intention of the General Assembly in enacting the statute was to allocate the prosecutorial powers, and thereby the investigatory powers, of the Commonwealth between the elected Attorney General and the individual, elected district attorneys. *Commonwealth v. Carsia, supra.* Nothing in the statute itself or in its available legislative history indicates that the General Assembly considered the Act would in any way involve the protection of the constitutional rights of criminal defendants. Clearly, appellee Goodman's contention that the Act somehow embodies his constitutional right to be free from unreasonable searches and seizures cannot find support from the statute alone.

It is also interesting to note that in the analogous cases dealing with extraterritorial arrests, the supreme court appears to consider violations of 42 Pa.C.S. § 8953, and its predecessors, to fall short of constitutional violations. *See* discussion of *Mason, supra.* If violations of the statutes in those cases denied an individual's constitutional rights, then suppression would presumably be an appropriate remedy, irrespective of compliance with procedural rules. Indeed, although the issue has never been before the supreme court, at least two members of that court have expressed their view that a violation of the statewide municipal jurisdiction statute does *not* result in the denial of an individual's constitutional rights. *Commonwealth v. Novick,* 500

23. U.S. CONST. amend. IV.
24. PA. CONST. art. I, § 8.

Pa. 546, 547, 458 A.2d 1350, 1351 (1983) (McDermott, J. dissenting, joined by Larsen, J.) ("[Defendant's] confession and a room full of stolen goods were suppressed, not because his constitutional rights were violated, but because he was arrested by the wrong police officer.")[25]

Federal decisions also provide us with some guidance. In *United States v. Harrington*, 681 F.2d 612 (9th Cir.1982), the court was faced with the following factual circumstances. Officers of the United States Customs Service conducted a warrant-authorized search of the defendant's home located in Del Mar, California. A variety of drugs, $100,000 in currency and other items were seized. The district court suppressed the evidence seized for the sole reason that "the customs officers should not have conducted the investigation that led to the search and seizure." *Id.* at 613. They lacked the authority to execute the search warrant because pursuant to an Executive Reorganization Plan,[26] all responsibility for in-land investigations of federal drug violations was vested in the Drug Enforcement Administration (DEA). Due to the violation of the Reorganization Plan, the federal district court suppressed the evidence, basing its decision on *United States v. Soto-Soto*, 598 F.2d 545 (9th Cir.1979).

On appeal, the Ninth Circuit reversed. The court first noted that "[n]othing in the Plan or its history suggests that the President or Congress favored the use of the exclusionary rule to deter noncompliance [with the Plan]." *United States v. Harrington*, 681 F.2d at 613–14. Furthermore, the court stated that *Soto-Soto* "approved the suppression of evidence seized not merely because the search violated a statute, but because the statutory violation undermined constitutional protections," and limited *Soto-Soto*'s application to "the border-search context." *Id.* at

25. In *Commonwealth v. Novick*, 500 Pa. 546, 458 A.2d 1350 (1983), the supreme court dismissed the appeal as having been improvidently granted and therefore never reached the merits of the case. *See also* note 19, *supra.*

26. See Reorg. Plan No. 2 of 1973, 3 A C.F.R. 263, 264 (1973), *reprinted in* 87 Stat. 1091 (1973), *amended by* Act of Mar. 16, 1974, Pub.L.No. 95–253, 88 Stat. 50.

614; *cf. Miller v. United States*, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958). Finding no violation of a constitutional right by the otherwise "perfect search", the court held "a court should not automatically suppress the evidence seized by an officer who, for some technical reason, should not have conducted the search." *Id.* 681 F.2d at 615. A violation of the Plan, which was promulgated by the President and approved and amended by Congress, and which allocated the investigatory authority of governmental agents, did not result in the type of unreasonable search and seizure contemplated by the Constitution. Standing alone, it did not warrant suppression.

The United States Supreme Court, in the companion cases of *United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), and *United States v. Chavez*, 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974), also refused to attribute a constitutional dimension to similar statutory violations. In *Giordano* and *Chavez*, the petitioners claimed that evidence obtained as a result of federal wiretaps should have been suppressed because of violations of the federal wiretap act. 18 U.S.C. §§ 2510–20. These violations resulted from the manner in which the Attorney General's Office applied for the wiretaps. In *Giordano*, the specific violation occurred when the Attorney General's Executive Assistant authorized the wiretap application. The Court stated it was clear that Congress, in an attempt to strictly limit the use of wire interceptions by law enforcement agents, authorized *only* the Attorney General or any Assistant Attorney General specially designated by the Attorney General to authorize a wiretap application. 18 U.S.C. § 2516(1). The Court found it "[p]lain[ ] enough" that the Executive Assistant was not one so authorized and, hence, the statute was violated. *United States v. Giordano*, 416 U.S. at 512–23, 94 S.Ct. at 1825–30.

As to the remedy applicable for this violation, the Court looked no further then the wiretap act itself. The act specifically provided for suppression of evidence obtained as a result of this type of statutory violation. *See* 18 U.S.C.

§§ 2515, 2518. However, the Court was emphatic in stating that the issue of suppression "does not turn on the judicially fashioned exclusionary rule aimed at deterring violations of Fourth Amendment rights, but upon the provisions of" the federal wiretap act.[27] As in *Harrington*, the violation was not of constitutional dimensions. *Cf. United States v. Chavez*, 416 U.S. at 570, 94 S.Ct. at 1853 ("There is no claim of any constitutional infirmity arising from this defect, nor would there be any merit to such a claim, and we must look to the statutory scheme to determine if Congress has provided that suppression is required . . .").

■ Based on our reading of *Mason* and on the federal authority referred to above, we do not consider the violation of the Commonwealth Attorneys Act which occurred in the instant case to have violated appellee Goodman's constitutional right to be free from unreasonable searches and seizures. There is no argument here that there was no probable cause to support the issuance of the search warrant, or that it was not issued by a neutral and disinterested judicial officer. The spirit and the letter of the Rules of Criminal Procedure, as well as the dictates of the Fourth Amendment, appear to have been observed. The lack of a statutory remedy and the plain intent of the Act lead us to conclude suppression is inappropriate in the instant case.[28] *See generally* W. LaFave, SEARCH AND SEIZURE § 1.3 (1978).

The order of the suppression court is reversed, and the case remanded for proceedings consistent with this opinion. Jurisdiction is not retained.

**27.** As to this section of the opinion, the Court was unanimous. *See United States v. Giordano*, 416 U.S. 505, 548, 94 S.Ct. 1820, 1842, 40 L.Ed.2d 341 (1974) (Powell, J., Concurring in part and Dissenting in part, joined by Burger, C.J., Blackmun, Rehnquist, JJ.).

**28.** Our decision, which denies the use of the exclusionary rule to deter noncompliance of the Commonwealth Attorneys Act by the Attorney General, does not mean the Attorney General may ignore the Act at his or her discretion. We believe that if a district attorney's authority was being usurped by the Attorney General, the statutory scheme behind the Act would permit the district attorney to challenge the Attorney General's authority to proceed with the prosecution. *Cf.* 71 P.S. § 732–205(a)(4).

MONTEMURO, J. files opinion in which WIEAND, CIR-
ILLO, DEL SOLE and JOHNSON, JJ., join.

SPAETH, President Judge, files concurring and dissent-
ing opinion in which BROSKY, J., joins.

WICKERSHAM, J., files concurring and dissenting opin-
ion in which POPOVICH, J., joins.

SPAETH, President Judge, concurring and dissenting:

I join in the majority's conclusion, and in the reasoning
supporting it, that in investigating appellee the Attorney
General exceeded the authority granted to him by the
Commonwealth Attorneys Act, 71 P.S. § 732–101 *et seq.*
But I cannot join in the majority's conclusion that we have
no power to remedy the Attorney General's violation of law.
In *Commonwealth v. Mason*, 507 Pa. 396, 490 A.2d 421
(1985), our Supreme Court prescribed the following test to
enable a court to determine when suppression of evidence is
an appropriate sanction for a violation of law:

> It is only where the violation ... implicates fundamental
> constitutional concerns, is conducted in bad-faith, or has
> substantially prejudiced the defendant...."
>
> *Commonwealth v. Mason, supra,* 507 Pa. at 406, 490
> A.2d at 426.

Here, the Attorney General's violation of the Common-
wealth Attorneys Act not only "implicates fundamental
constitutional concerns;" it implicates *the* "great question"
of constitutional law: When the people, either of the United
States or of a State, delegate authority to a constitutional
officer, whether to the President, an Attorney General, or
other, what "practical security" can be provided against a
transgression of that authority? Here, except suppression,
*no* practical security can be provided. The order of the trial
court should therefore be affirmed.

The classical statement of the fundamental constitutional
concern implicated in this case is by Madison in *The Feder-
alist Papers:*

It will not be denied that power is of an encroaching nature and that it ought to be effectually restrained from passing the limits assigned to it. After discriminating, therefore, in theory, the several classes of power, as they may in their nature be legislative, executive, or judiciary, the next and most difficult task is to provide some practical security for each, against the invasion of the others. What this security ought to be, is the great problem to be solved.

*The Federalist* No. 48, at 308 (J. Madison) (Clinton Rossiter, ed. 1961).

The great problem was solved in *Marbury v. Madison,* 5 U.S. (1 Cranch) 138, 2 L.Ed. 60 (1803):

That the people have an original right to establish, for their future government such principles, as, in their opinion, shall most conduce to their own happiness is the basis on which the whole American fabric has been erected. The exercise of this original right is a very great exertion; nor can it, nor ought it, to be frequently repeated. The principles, therefore, so established, are deemed fundamental. And as the authority from which they proceed is supreme, and can seldom act, they are designed to be permanent.

This original and supreme will organizes the government, and assigns to different departments their respective powers. It may either stop here, or establish certain limits not to be transcended by those departments. The government of the United States is of the latter description. The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written. To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained? The distinction between a government with limited and unlimited powers is abolished, if those limits do not confine the persons on whom they are imposed, and if acts prohibited and acts allowed, are of equal obligation.

*Id.* at 176–77 (MARSHALL, C.J.).

The task of determining whether the legislature has transgressed the limited powers delegated to it by the people belongs to the judiciary, for "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Id.* at 177. Finding that the legislature had transgressed its limited powers, by enacting an act providing that the Supreme Court should have the power to issue writs of mandamus, the Court declared the act unconstitutional and therefore of no effect.

The principle established by *Marbury v. Madison* is of course applicable not only to the legislature but equally to the executive. In *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), the President of the United States had ordered his Secretary of Commerce, Charles Sawyer, to seize several steel mills. The seizure was not based on any statutory or other Congressional authorization but on asserted necessity: the nation was at war, and the seizure was to avert a strike that threatened to cripple steel production. In these circumstances, the government argued, "presidential power should be implied from the aggregate of his powers under the Constitution." *Id.* at 587, 72 S.Ct. at 866. The Court nevertheless held the seizure invalid. Justice BLACK, writing for the Court, stated the issue as follows: "We are asked to decide whether the President was acting within his constitutional power when he issued an order directing the Secretary of Commerce to take possession of and operate most of the Nation's steel mills." *Id.* at 582, 72 S.Ct. at 864. In holding that the President was not acting within his constitutional power, Justice BLACK rejected the concept of "implied" or "inherent" powers, and reaffirmed the strictly limited nature of the powers of the executive: "The President's power ... to issue the order must stem either from an act of Congress or from the Constitution itself." *Id.* at 585, 72 S.Ct. at 866. Justices FRANKFURTER, DOUGLAS, JACKSON, AND BURTON agreed, and in separate concurring opinions expressed their reasons why they

434

found the President's act beyond his limited powers.[1] For our purposes, the opinion of Justice JACKSON is especially pertinent.

The exercise of executive authority, Justice JACKSON said, occurs in three cases: (1) where the executive officer acts pursuant to statutory authority; (2) where the officer acts in the absence of statutory authority; and (3) where the officer acts in a sphere in which the legislature has determined that the officer is *not* to act. In the first case, the constitutional authority of the executive officer is at its fullest, for the officer's act is authorized by all the power that the people have delegated to both the legislative and executive branches. In the second case, the authority of the officer depends solely upon the power delegated to the executive. In the third case, which Justice JACKSON believed to be the case in *Youngstown,* the authority of the officer is at its "lowest ebb", for in such a case the power delegated by the people to the legislature must be subtracted from that delegated to the executive. *Id.* at 635–37, 72 S.Ct. at 870–71 (JACKSON, J., concurring)

The present case falls squarely within Justice JACKSON's third category. The Attorney General is one of five constitutionally provided statewide elected executive officers.[2] As a constitutional officer, the Attorney General has

1. Justice CLARK, while holding the President's act illegal, did not believe that the President lacked "inherent power" under the Constitution to act in emergency situations. In his view, however, if Congress provided procedures to be followed in a given situation, the President was required to follow those procedures. Justice CLARK found that in the case before the Court, Congress *had* provided such procedures, specifically, in the Selective Service Act of 1948, which authorized the President to seize plants that failed to produce goods required by the armed forces.

2. A "constitutional officer" is "the incumbent of an office expressly recognized in the Constitution." *Commonwealth ex rel. Specter v. Martin,* 426 Pa. 102, 110, 232 A.2d 729, 734 (1967). The other four constitutionally provided statewide elected executive officers are the Governor, the Lieutenant Governor, the Auditor General, and the State Treasurer. Pa. Const., Art. 4, §§ 1, 2, 4, 4.1, 18. The Constitution also provides that the Superintendent of Public Instruction shall be an officer of the executive branch, *id.* § 1, but the Superintendent, or Secretary of Education, is an appointed officer, *id.* § 8(a).

no inherent or implied powers; his powers are limited to those delegated to him by the people. In creating the office of Attorney General, the people of the Commonwealth provided that the Attorney General "shall be the chief law officer of the Commonwealth and *shall exercise such powers* and perform such duties *as may be imposed by law.*" Pa. Const. Art. 4, § 4.1 (emphasis added). Pursuant to this provision, the legislature has defined the particular powers that may be exercised by the Attorney General. 71 P.S. §§ 732–201 to 208. Those particular powers, therefore, are the powers "imposed by law" on the Attorney General; they are the *only* powers that the Attorney General may constitutionally exercise. (To be sure, the legislature may from time to time alter those powers. In that event, the only powers the Attorney General will be able to exercise will be as altered.) The majority has concluded, and I agree, that here, in investigating appellee, the Attorney General transgressed the limited powers conferred upon him. He thereby acted unlawfully, precisely to the same degree as the Congress acted unlawfully in providing that the Supreme Court should have the power to issue writs of mandamus, *Marbury v. Madison, supra,* and as the President acted unlawfully in ordering his Secretary of Commerce to seize the steel mills, *Youngstown Sheet & Tube Co. v. Sawyer, supra.* Since the Attorney General's unlawful investigation of appellee thus "implicates fundamental constitutional concerns", the results of the investigation should be suppressed. *Commonwealth v. Mason, supra.* For to condemn an act while withholding any remedy is to permit the act. And yet, that is what the majority has done; without suppression of its results, the investigation of appellee, while unlawful, will have achieved its intended result.

With our decision today, one is left to ask, as the Chief Justice asked in *Marbury v. Madison:* "To what purpose", then, did the people of the Commonwealth limit the power of the Attorney General? "[I]f th[o]se limits may, at any

time, be passed by those intended to be restrained... [t]he distinction between a government with limited and unlimited power is abolished...." *Id.* at 177. Surely, we have failed to heed Justice JACKSON's words:

> The executive action we have here originates in the individual will of the President and represents an exercise of authority without law.
>
> .    .    .    .    .
>
> With all its defects, delays and inconveniences, men have discovered no technique for long preserving free government except that the Executive be under the law, and that the law be made by parliamentary deliberations. Such institutions may be destined to pass away. But it is the duty of the Court to be last, not first, to give them up. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. *supra* at 655, 72 S.Ct. at 880 (JACKSON, J., concurring) (footnote omitted).[3]

The order of the trial court suppressing the results of the Attorney General's illegal investigation should be affirmed.

WICKERSHAM, Judge, concurring and dissenting:

The defendant-appellee, David A. Goodman, was charged by Criminal Information filed in the Court of Common Pleas of Allegheny County, Pennsylvania, Criminal Division, at No. CC8204435A with eleven (11) counts of Possession of Prohibited Offensive Weapons, one (1) count of Theft of Services and one (1) count of Possession of Device for Theft of Telecommunications Services. The prohibited offensive

---

3. The authority relied on by the majority is inapposite. In *United States v. Harrington*, 681 F.2d 612 (9th Cir.1982), the issue was the applicable remedy where *officers of the United States Customs Service—not* a constitutional officer like the Attorney General—went beyond the authority *vested in them by an Executive Reorganization Plan.* Similarly, in *United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), the official in question was a subordinate of the Attorney General who had wrongfully arrogated to himself powers vested by the statute in his superior. There was no violation of law by the superior.

weapons in question were: a Rossi double barrel sawed-off shotgun; a Ruger AC–556 and AC–556K automatic rifle; a water-cooled machine gun, caliber 30–06; a M–60 machine gun; a Heckler & Koch G–3, caliber 308 (7.62 MM) automatic weapon; a Heckler & Koch MP5K, caliber 9MM automatic weapon; three (3) UZ1 9MM caliber automatic weapons; a Heckler & Koch MP55D, caliber 9 MM automatic weapon; and a Colt M–16AL caliber .223, an automatic rifle.

I agree with the majority's conclusion that suppression was inappropriate in the instant case and that, therefore, the lower court erred in granting appellee's motion to suppress all intercepted wire communications, all articles seized pursuant to the search of his office/residence, and all statements made to the officers conducting the search. I disagree, however, with the majority's conclusion that the Attorney General had neither the authority to investigate appellee under the Commonwealth Attorneys Act, 71 P.S. § 732–206, nor a reasonable belief to prosecute appellee under the corrupt organizations statute, 18 Pa.C.S. § 911.

The Commonwealth argues, *inter alia*, in its brief:

"The court below erred in suppressing evidence seized during searches conducted in appellee's office/residence by agents of the Attorney General. At the time the searches were conducted, the Attorney General had a reasonable belief that based on the information available to him, the appellee was engaged in activity which merited an investigation by the Attorney General under 71 Pa.C.S.A. § 732–205(a)(2) (relating to corrupt organizations) and 71 Pa.C.S.A. § 732–206(b) (relating to investigating grand juries). The Commonwealth further maintains that the investigatory power of the Attorney General, as provided by 71 Pa.C.S.A. § 732–206, must necessarily be broader than his prosecutorial power (71 Pa.C.S.A. § 732–205) in order that it be determined whether an activity constitutes one of the eight areas that the Attorney General is directed to prosecute.

\* \* \*

"The Attorney General had a reasonable belief, based on the information available to him, that appellee was engaged in activities that the Attorney General was required to investigate and prosecute under 71 Pa.C.S.A. § 732–205(a)(2) (relating to corrupt organizations) and 71 Pa.C.S.A. § 732–206(b) (relating to investigating grand juries).[3] ([3] While it may be argued that § 732–205 of the Act should not be read to limit the areas in which the Attorney General may prosecute, accepting such an interpretation is not necessary to decide the present case. Instead, the court need only determine that the Attorney General was acting within the scope of the investigative powers conferred upon him by the Act.) Based on the information provided by a Bell employee, the Attorney General was aware of the strong possibility that the blue boxes were being transported between counties. Certainly, Attorney Claus was correct in his initial determination that movement of the illegal devices from county to county would be a crime best suited for investigation by the Attorney General who, unlike a county district attorney, has statewide jurisdiction.[4] ([4] 71 Pa.C.S.A. § 732–205(a) provides, in part, that: 'The Attorney General shall have power to prosecute in *any* county criminal court the following cases ...' (emphasis added).) The applicable satute [sic], 71 Pa.C.S.A. § 732–206(b) states:

> The Attorney General shall convene and conduct investigating grand juries as provided in the act of November 22, 1978 (P.L. 1148, No. 271), known as the 'Investigating Grand Jury Act.'

It is evident that the word 'shall' denotes the mandatory nature of that responsibility. *See* generally *Zimmerman v. O'Bannon*, 497 Pa. 551, 442 A.2d 674 (1982).

"This reading of the Act is further strengthened by 71 Pa.C.S.A. § 732–206(a) 'The Attorney General shall have the power to investigate any criminal offense which he has the power to prosecute. The decision to initiate a prosecution under § 732–205 will arise where the attorney general is made aware of facts that justify his commencement of a prosecution. Normally, information first brought to the

attorney general's attention will be an insufficient basis upon which to render a decision to prosecute. Instead, initial facts will require further investigation to determine whether an activity arises to a crime that warrants prosecution by the attorney general under § 732-205. The failure to prosecute would not, by itself, serve as an indication that the investigation was unwarranted. Rather, the dispositive question is whether the facts known to the attorney general would justify his decision to investigate. In this context, the court below noted at the suppression hearing:

> [W]hen you get into the area of what he can prosecute, you are in a much more confined area than where you are in the area of what you can investigate. Because it doesn't take a Rhodes Scholar to realize you can't know whether you are in the area of a prosecution until at least you do some investigation.'

(ST Vol. II, 49)

The court went on to note that one 'can't apply it [the Act] with hindsight.'  (ST Vol. II, 51)

"The Commonwealth submits that the Attorney General dealt with this very problem in executing the search warrants herein.  Based on the information known to him the attorney general after consulting with the office of the district attorney made a reasonable determination that appellee was engaged in conduct which would fall within the areas he was required to prosecute under 71 Pa.C.S.A. § 732-205 and hence he was under a duty to investigate further.  Not only did the attorney general have information indicating activities ripe for grand jury investigation under § 732-206(b), but he had evidence on which to base a reasonable belief that the appellee's activities were in furtherance of a corrupt organization which the attorney general is required to prosecute as provided in § 732-205(a)(2). See also 18 Pa.C.S.A. § 911(e).

"The attorney general had information, prior to execution of the search warrants, that appellee was engaged in a

pattern of racketeering and that the profits gained from these activities were used in furtherance of a legitimate enterprise—a law office. See 18 Pa.C.S.A. § 991(b), (h). Specifically, appellee, by repeatedly using the blue box on April 15 through April 16 conducted a pattern of activity; namely, theft of services. This criminal activity is explicitly covered by § 911 at (h)(1)(i) 'Chapter 39 (relating to theft and related offenses'). The attorney general acting as a reasonable public agency with investigative powers, had reason to surmise that appellee used the profits from this unlawful activity to further a legitimate enterprise, in this case a law practice. It is important to note that the Bell recording devices revealed that appellee, in answering his phone, identified himself as 'Attorney Goodman.' Mr. Claus testified that it was under this interpretation of § 911 that he determined an investigation by the attorney general was necessary. The Commonwealth maintains that given the evidence known to the attorney general prior to the issuance of the search warrants, that belief was well-founded in the applicable law. To hold otherwise, you require the attorney general to not investigate an activity unless his initial contact with the activity would lead him to determine, with complete certainty, that the matter should be prosecuted by his office. Common-sense dictates that when initial facts indicate that an activity may involve a crime subject to the attorney general's prosecuting powers, the attorney general should enter into further investigation of those facts. Ensuring a broader scope of power for investigation under the Act, is of primary importance to the attorney general since his area of prosecutorial responsibility involves highly complex areas of criminal activity that would involve the sifting of many disparate elements."

Brief for Appellant at 11 and 14–18.

I agree and accordingly dissent to the first part of the majority's opinion.